923 So.2d 627 (2006)
Peter T. LEMANN and Nancy Nafe Lemann
v.
ESSEN LANE DAIQUIRIS, INC., et al.
No. 2005-CC-1095.
Supreme Court of Louisiana.
March 10, 2006.
*629 Simoneaux, Carleton, Dunlap & Olinde, Henry D.H. Olinde, Jr., Scott E. Mercer, Baton Rouge, for Applicant.
The Law Offices of Arthur A. Lemann III, & Associates, Arthur A. Lemann, III, Arthur A. Lemann, IV, New Orleans; Atkinson, Perry, Atkinson & Balhoff, John W. Perry, Jr., Randi Ellis, Baton Rouge; Office of the Parish Attorney, James L. Hilburn, Randy B. Ligh, Baton Rouge, Freddie Paul, Pro se, for Respondent.
WEIMER, Justice.
We granted certiorari in this case to determine if the lower courts erred in denying the motion for summary judgment filed by a city/parish emergency medical services department. The department was sued by the surviving parents of a young man allegedly deprived of a chance of survival by paramedics who did not transport him to a hospital for evaluation after being called to the scene of a fistic encounter in the parking lot of a bar. Given the facts of this case, we find that the emergency medical services personnel are not liable. Because defendants are entitled to judgment as a matter of law, we grant the motion for summary judgment.

FACTS AND PROCEDURAL HISTORY
This wrongful death and survival action results from the death of Parker Lemann. On March 30, 2002, Parker was involved in a fight with a person, who was later alleged to be Freddie Paul, in the parking lot of the French Quarter Daiquiris Bar in Baton Rouge, Louisiana.
Responding to a call from a person at the bar, two Baton Rouge City Police officers, John Gonzales and Christopher Taylor, arrived to investigate the incident. After the officers located Parker sitting in the cab of his truck, and after they determined Parker was unarmed, the officers called the City of Baton Rouge/Parish of East Baton Rouge Department of Emergency Medical Services (EMS) to *630 send a unit to the scene because it appeared that Parker had a cut left hand which he had wrapped in a blood-stained shirt.
Paramedics Louis Berthier and Farol Champlin, accompanied by an EMT (emergency medical technician) student, answered the Code 1 police call, which means "no lights, no sirens, no life-threatening injuries.... No signs of emergency." The paramedics examined Parker, who did not exhibit or complain of any serious injuries. Champlin twice offered to take Parker to a nearby hospital, but he refused both offers. The paramedics presented Parker with a standard form which he signed, acknowledging his refusal of EMS's offers of transportation. When the paramedics left the scene, Parker was as they had found him, in the "custody" of the police. The police did not tell the paramedics whether or not Parker was under arrest, although Parker told them he was.
Later, one of the police officers, after issuing a summons for Parker, dropped him off at his apartment complex. Approximately an hour and a half later, two deputies from the parish sheriff's office responded to a call from one of the residents of the complex. They found Parker lying at the top of an apartment stairwell. Because he had apparent injuries[1] at that time, EMS was summoned and two other paramedics responded.
EMS transported Parker to the hospital where he was diagnosed with a fractured skull and a subdural hematoma. Despite surgery, Parker died two days later on April 1, 2002. He was 21 years of age.
Parker's parents, Peter T. Lemann and Nancy Nafe Lemann, filed suit against several defendants, including the paramedics, Louis Berthier and Farol Champlin,[2] and their employer, the City of Baton Rouge/Parish of East Baton Rouge through the Department of Emergency Medical Services (collectively "EMS defendants").[3] The EMS defendants answered the petition, pleading among other things, entitlement to statutory immunity.[4]
Following discovery and prior to trial, the EMS defendants filed a motion for summary judgment, which the district court denied because of the existence of genuine, disputed issues of material facts. The district court did not specify what facts formed the basis of the denial.
The EMS defendants applied for a writ, which the majority of the appellate court panel denied for the same reason cited by the district court. Lemann v. Essen Lane Daiquiris, Inc., 05-0364 (La.App. 1 Cir. *631 4/18/05) (Parro, J., dissenting). This court granted a writ in order to review the propriety of the lower courts' denial of summary judgment. Lemann v. Essen Lane Daiquiris, Inc., 05-1095 (La.6/24/05), 904 So.2d 745.
In support of their motion for summary judgment, the EMS defendants filed 16 exhibits. Included in the EMS defendants' exhibits are affidavits by Berthier and Champlin attesting to the fact that on March 30, 2002, they were employed as paramedics[5] with the City of Baton Rouge/Parish of East Baton Rouge Department of Emergency Medical Services. The affidavits further state that affiants held valid current certifications as paramedics from the State of Louisiana Department of Health and Hospitals, which were kept current by necessary training and refresher courses.
Defendants' exhibits also included excerpts from depositions of the two paramedics and the two police officers, who described their activities after they arrived at the scene in the parking lot of the bar.
The exhibits submitted established that a person at French Quarter Daiquiris called Baton Rouge Police Department to report a disturbance. Officers John Gonzales and Christopher Taylor with the Baton Rouge Police Department responded to the scene. Parker was in his truck. The officers asked him to get out of his truck, and he complied. It appeared that Parker had been drinking. When the police officers searched Parker, they concluded he had been in a fistic encounter. However, by the time the police arrived, the witnesses to the disturbance had already left. Significantly, none of the witnesses were at the scene to tell the police or paramedics about the nature or extent of the fight.
Parker had a T-shirt or towel, which was spotted with blood, wrapped around his hand. The police officers called City/Parish EMS to examine a suspected cut on Parker's hand.
When EMS paramedics Berthier and Champlin arrived at the scene, Parker was standing near the police car. Berthier and Champlin took a history from Parker and asked him what happened. Parker did not have any trouble answering the paramedics' questions. He stated that he got into a fight, punched someone, and his hand was hurting.
The paramedics found Parker was conscious, oriented, and alert. Champlin testified Parker was "alert times three," meaning alert as to person, place and time. This testimony was verified by the testimony of Officer Gonzales. Parker's only complaint of injury was to his hand. The paramedics asked him if he had any other complaints, and Parker said there were none.
Parker did not lose consciousness while EMS personnel were present. The paramedics asked him if he had lost consciousness previously, and he said, "No." In deposition, Officer Gonzales testified Parker did not lose consciousness prior to the arrival of the EMS personnel.
Paramedic Berthier performed a visual assessment and physical examination of Parker, finding only an abrasion to his left hand. Berthier examined his head and other areas for injuries. He looked and felt through and around Parker's head for injuries or abnormalities, but did not find any. He lifted Parker's shirt and examined *632 his torso. He checked his neck and back. Parker's pupils were equal and reactive to light. He moved all extremities in a satisfactory and appropriate manner. His vital signs were normal.
The paramedics offered to take Parker to the hospital to be checked out further, but Parker refused. They offered to take him to the hospital a second time, and again Parker refused. Thereafter, Parker signed a form waiving and refusing transportation to the hospital; he had no difficulty signing the refusal form. Berthier, Champlin, and the EMT student signed the refusal form as witnesses. When the paramedics left the scene, Parker was talking with the police officers.
Shortly thereafter, Officer Gonzales drove Parker to his nearby apartment complex. At no time during Officer Gonzales's entire contact with Parker on March 30, 2002, did Parker complain to him of any injuries or pain. According to Officer Taylor, taking an intoxicated person home was a "reasonable" thing for police to do in order to prevent the person from driving his own vehicle. The police were unsure whether Parker or one of them had locked his keys in his truck. Officer Gonzales dropped Parker off and left.
The facts also establish that the police officers had encountered an intoxicated Parker four days earlier at the same bar. On that date, he was released to the custody of his father and told not to return to that bar.
In opposition to the motions of the police defendants and the EMS defendants, plaintiffs filed a memorandum and a "STATEMENT OF DISPUTED FACT," accompanied by 24 exhibits.

DISCUSSION
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342 (La.1991). A court must grant a motion for summary judgment "if the depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law." LSA-C.C.P. art. 966(B). The summary judgment procedure is favored under our law. LSA-C.C.P. art. 966(A)(2). Paragraph C(2) of Article 966, which reads as follows, is especially pertinent in the instant case:
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. [Emphasis supplied.]
Because the applicable substantive law determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. See Richard v. Hall, 03-1488, p. 5 (La.4/23/04), 874 So.2d 131, 137. The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability *633 under LSA-C.C. art. 2315. Mathieu v. Imperial Toy Corporation, 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 321. This approach provides an analytical framework for evaluation of liability. One analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). Fowler v. Roberts, 556 So.2d 1, 4 (La.1989), reh'g granted on other grounds and original opinion reinstated as supplemented, 556 So.2d at 13 (La.1990). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. See Mathieu, 94-0952 at 11, 646 So.2d at 326. See also, Daye v. General Motors Corporation, 97-1653, p. 9 (La.9/9/98), 720 So.2d 654, 660; Perkins v. Entergy Corporation, 98-2081, p. 21 (La.App. 1 Cir. 12/28/99), 756 So.2d 388, 403, aff'd, XXXX-XXXX, XXXX-XXXX, 00-1440 (La.3/23/01), 782 So.2d 606.
A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. Meany v. Meany, 94-0251, p. 6 (La.7/5/94), 639 So.2d 229, 233. Whether a duty is owed is a question of law. Peterson v. Gibraltar Savings and Loan, 98-1601, 98-1609, p. 7 (La.5/18/99), 733 So.2d 1198, 1204; Mundy v. Department of Health and Human Resources, 620 So.2d 811, 813 (La.1993); Faucheaux v. Terrebonne Consolidated Government, 615 So.2d 289, 292 (La.1993). In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. See Socorro v. City of New Orleans, 579 So.2d 931, 938 (La.1991). The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty. Faucheaux, 615 So.2d at 292; Perkins, 98-2081at 22, 756 So.2d at 404. The duty of a paramedic can be broadly defined as the duty to render appropriate medical care based on the facts and circumstances of the medical situation with which they are presented. Cf. Rathey v. Priority EMS, Inc., 04-0199, p. 2 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 479 (Love, J., concurring in part, dissenting in part), writ denied, XXXX-XXXX La. 5/6/05, 901 So.2d 1107, 05-0802 (La.5/6/05), 901 So.2d 1108. (The duty of an EMT is to administer adequate emergency medical treatment and to protect those persons in need of emergency medical treatment from further injury.)
In this case, plaintiffs argue that defendants breached that duty by "not removing Parker to a hospital." Plaintiffs rely partially on the deposition testimony[6] of Dr. *634 Kenneth Vogel, a neurosurgeon, who agreed that the paramedics' external examination may not have detected a closed head injury. Relying on Dr. Vogel's testimony, plaintiffs state:
It is important to understand that we do not fault the paramedic defendants for failing to diagnose Parker's subdural hematoma. After all, the paramedic defendants are not trained as medical doctors, let alone neurosurgeons. Rather, we fault the paramedic defendants for not removing Parker to a hospital pursuant to their protocol where an "extremely high index of suspicion" would have been exercised.
Plaintiffs then elaborate on the paramedics' alleged omissions: "(1) the paramedic defendants made no attempt to communicate with a physician concerning Parker's condition; (2) the paramedic defendants completely failed to follow their own protocol for head injuries by transporting Parker to a hospital; and (3) ... the City/Parish does not have a protocol for refusing medical treatment."
Assuming for the sake of discussion that the EMS protocol is before this court as a proper attachment to plaintiffs' opposition to the motion for summary judgment, the protocol for head injuries is not relevant because the paramedics at the time they were at the scene observed no indication that Parker had a serious head injury. Paramedic Champlin's deposition testimony under cross examination was that Parker did not fit into her head injury protocol. Plaintiffs' relating the opinion of Dr. Vogel to the alleged omissions of the paramedics is to judge their actions based on the "distorting effects of hindsight."[7]
Plaintiffs contend there are disputed material facts which bar summary judgment because of the disparity between the police defendants' description of Parker's condition and the description of his condition by EMS employees Berthier and Champlin. Plaintiffs note that there was a very short period between the two time periodsi.e., the time when the police officers were present at the bar and the time of the arrival of the paramedics. They assert Parker's condition could not have changed so dramatically as to substantiate the paramedics' description. At any rate, the plaintiffs argue, the differences in the descriptions create a material factual issue as to whether Parker was capable of waiving transportation.
Plaintiffs filed excerpts from the deposition testimony of Officer John Gonzales who testified that Parker was intoxicated. He admitted he had written the police report which stated Parker had "slurred speech" and was "very incoherent" and made "erratic body movements." At the deposition, Officer Gonzales explained he found Parker incoherent because he was mumbling something about a girl and some dishes in response to questions from the officers. Significantly, when asked if Parker lost consciousness before the EMS arrived, the officer stated he did not.
*635 Further, Officer Gonzales explained that he had assumed the blood on Parker was from a cut hand, but when it was revealed there was no obvious injury, the other possibility was that the blood came from someone else, presumably the individual with whom Parker had fought. His testimony verified that the paramedics performed a thorough examination of Parker's head.
Although the testimony of Officer Gonzales paints a picture of Parker that differs from that of the EMS defendants, who found Parker alert and oriented, there is nothing in his testimony or in his action of driving Parker to his apartment complex that indicates Officer Gonzales concluded Parker exhibited anything other than intoxication.
On a motion for summary judgment, the court does not weigh the testimony. Instead, we view the exhibits to determine if there is a material factual issue in dispute. As we previously mentioned, materiality is determined pursuant to the substantive law involved in any particular case. Here, the materiality of the disparity between the police officers' observance of Parker and the paramedics' observance of Parker is whether the paramedics were negligent in deciding that Parker's condition did not prevent him from waiving the offered transportation to the hospital.
Even if we concede a conflict between the observations of the police and the paramedics and further concede the short time span between their observations, the EMS defendants were entitled to rely on their physical examination and observations of Parker's condition. Although the police testified they observed slurred and incoherent speech and erratic behavior, there is no evidence these observations were communicated to the paramedics. Further, the police officers' observations of Parker did not uncover evidence of unconsciousness or serious head trauma. The behavior exhibited to the police was not linked evidentially to serious head trauma and could be attributed to intoxication, a condition the police had observed from Parker a few days earlier during the investigation of a prior incident. Regardless of the behavior displayed to the police, there is no evidence that Parker was incapable of waiving medical treatment when the paramedics arrived. The paramedics had no obligation to conduct an investigation beyond examining the patient they were summoned to treat when they were called out to a non-emergency situation and found a non-emergency situation upon their arrival.
The following is apropos in response to the argument of the plaintiff that Parker should have been taken to the hospital despite being twice offered transportation, refusing the two offers to be taken there, and signing a waiver form: "What the plaintiff is arguing for is mandatory transportation to a hospital for all intoxicated accident victims, regardless of whether they appear to be injured, and regardless of their consent or lack of consent."[8] We do not find an obligation on the part of Berthier and Champlin to force Parker, against his will, to be transported to a hospital when their assessment of his condition reasonably could have been no more than intoxication and cuts and scrapes.
In Louisiana, the parameters of medical services that EMS personnel can provide to an ill or injured person are established by statute. See LSA-R.S. 40:1234. Significantly, Louisiana recognizes the right of an adult to refuse to consent to medical or surgical treatment of *636 his own person. See LSA-R.S. 40:1299.56 ("Nothing contained [in the Louisiana Medical Consent Law] shall be construed to abridge any right of a person eighteen years of age or over to refuse to consent to medical or surgical treatment as to his own person.") See also, Roberson v. Provident House, 576 So.2d 992, 994 (La.1991), citing Hondroulis v. Schuhmacher, 553 So.2d 398, 410 (La.1988), on reh'g (La.1989), for the proposition that the right to privacy contained in Article 1, § 5 of the 1974 Louisiana Constitution protects an individual's right to decide whether to obtain or reject medical treatment. The EMS personnel must balance fulfilling a person's emergency medical needs with respecting a person's wish not to be treated or transported to the hospital. See Kyser v. Metro Ambulance, Inc., 33,600, p.13 (La.App. 2 Cir. 6/21/00), 764 So.2d 215, 223. Parker had a statutory right to refuse transportation which the EMS personnel were obligated to respect so long as he was capable of exercising that right.[9] Several of the matters plaintiffs cite that may create a factual dispute concerning Parker's condition were uncovered later, as a result of an investigation following his death. As the police officer testified, the witnesses to the fistic encounter had all left the bar before the police and EMS personnel got there.
According to plaintiffs' averments, if a person refuses to go to the hospital, the paramedics may be held liable for respecting his rights and not taking him. In order to avoid this liability, the paramedics would be forced to violate the person's statutorily granted refusal rights and transport him against his will, thus, leaving themselves vulnerable to suit for the tort of false imprisonment or battery. The EMS defendants label this dilemma as a "no-win situation." Indeed, allowing EMS personnel to be subject to possible litigation for making one of two choices would represent a choice between Scylla and Charybdis,[10] particularly in this matter where Parker was alert, oriented, in no distress, and denied unconsciousness.
The plaintiffs have presented no evidence sufficient to show they will be able to meet their burden of proof at trial that Berthier and Champlin, as employees of the City/Parish EMS Department, breached their duty to administer adequate medical treatment to Parker by not taking him to the hospital against his will and instead leaving him in the care of the police officers. Champlin testified that Parker twice refused transportation to the hospital  once adamantly by responding "hell no"  and voluntarily signed a release form presented to him by the paramedics, with full knowledge that he was refusing transportation, not treatment. By the time the paramedics arrived at the scene, Parker was conscious, not bleeding, and had normal vital signs. There is no evidence to suggest their examination of Parker was inadequate given the circumstances.[11] *637 Faced with Parker's resolve not to be transported to the hospital, the paramedics could not be expected to attempt to force Parker to be transported from the scene. Thus, Parker was left, not alone, but in police custody by the paramedics who were unaware of what official action, if any, the police would take after the paramedics departed from the scene.

CONCLUSION
Contrary to plaintiffs' argument to this court, our review of the record shows no conflict between the deposition testimony of the police officers and the deposition testimony of the paramedics which would create a genuine issue of material fact. The EMS defendants simply cannot be held to knowledge or constructive knowledge of anything that happened either before they arrived at the parking lot in answer to a non-emergency police call or after they left. The paramedics properly acted on their observation and examination of Parker; they determined that his physical and mental condition did not warrant forcing him to be transported to a hospital. The paramedics' utilization of empirical evidence of Parker's capacity to refuse transportation by the paramedics and the lack of empirical evidence of a serious, but hidden, head injury simply do not show that the paramedics breached a duty to Parker. Any responsibility to transport him was negated by the exercise of Parker's statutory right to waive medical treatment which was twice offered, twice refused, and then refused again with the execution of a waiver form.
Based on our review of the record, we conclude there are no genuine issues of material fact with regard to the EMS defendants' motion for summary judgment. The lower courts erred in denying summary judgment.

DECREE
Accordingly, for the reasons expressed above, the portion of the district court's judgment denying summary judgment to Louis Berthier and Farol Champlin, as well as the City of Baton Rouge/Parish of East Baton Rouge through the Department of Emergency Medical Services, is reversed; summary judgment is rendered, dismissing plaintiffs' suit against these defendants.
CALOGERO, C.J., dissents for the reasons assigned by Associate Justice KIMBALL.
KIMBALL, J, dissents and assigns reasons.
JOHNSON, J., dissents.
KIMBALL, Justice, dissenting.
I disagree with the majority's conclusion that the defendants are entitled to summary judgment. In my view, the dispute over Parker's condition is a genuine issue of material fact that precludes summary judgment.
According to Officer John Gonzales, Parker was intoxicated and smelled of alcohol. Parker's speech was slurred and incoherent, and his body movements were very exaggerated and erratic. Moreover, Officer Bryan Taylor recalled seeing dried blood around Parker's nose and assumed it was from a nose bleed.
According to Paramedic Farol Champlin, however, Parker did not smell of alcohol, and therefore, the paramedics did not test Parker for blood or alcohol overdose. She said his pupils were equal and reactive to light and his eyes were not at all red or bloodshot. Paramedic Champlin described Parker as coherent, conscious and alert. His color, respiration and pulse were normal. Paramedic Champlin further stated that Parker moved all extremities, did not *638 stagger and did not have spasmodic or exaggerated movements.
The majority states that, "Here, the materiality of the disparity between the police officers' observance of Parker and the paramedics' observance of Parker is whether the paramedics were negligent in deciding that Parker's condition did not prevent him from waiving the offered transportation to the hospital." That disparity calls the paramedics' credibility as witnesses into question. The credibility of a witness is a question of fact. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). Consequently, the trial judge cannot make credibility determinations on a motion for summary judgment. Hutchinson v. Knights of Columbus, 03-1533, p. 8 (La.2/20/04), 866 So.2d 228, 234. Thus, I disagree with the majority's finding that no evidence exists that Parker was incapable of waiving medical treatment when the paramedics arrived.
NOTES
[1] As to Parker's condition after the lapse of an hour and a half between the two calls to EMS, Champlin's deposition testimony was that "[s]omething else had to have happened to him after we left him.... He did not have those [visible] injuries when we left him."
[2] The paramedics were incorrectly named in the plaintiffs' petition, an error corrected in the defendants' answer.
[3] Other defendants named in the suit are: Police Officer John W. Gonzales; Police Officer Christopher Taylor; their employer, the City of Baton Rouge (collectively, "police defendants"); Essen Lane Daiquiris, Inc.;

French Quarter Daiquiris, Inc.; and Freddie Paul, the individual with whom Parker allegedly fought. Although the police defendants filed a motion for summary judgment, which also was denied, they are not before this court at the present time. Nothing in this opinion addresses the issue of the police defendants' alleged liability.
[4] In brief and argument to this court, the parties have debated the applicability of statutory immunity pursuant to LSA-R.S. 37:1732, LSA-R.S. 40:1233, and LSA-R.S. 9:2798.1. Because we resolve this case on other grounds, it is unnecessary to discuss these statutory provisions.
[5] Technically, Berthier and Champlin are "EMT-paramedics." Multiple levels of certifications for emergency medical technicians exist. The relevance of the various levels is that, by statute, the level of certification dictates the extent of medical care an EMT is legally allowed to perform. See LSA-R.S. 40:1234.
[6] We note that several of the exhibits attached to plaintiffs' opposition to the motion for summary judgment fail to meet the criteria established by statute for an opposition. Plaintiffs' exhibits include excerpts from several depositions, which do meet the criteria specified by LSA-C.C.P. art. 966. However, plaintiffs filed no affidavits, and their exhibits include several unsworn statements and uncertified documents that are not in compliance with the criteria of LSA-C.C.P. art. 967, which provides in pertinent part:

A. Supporting and opposing affidavits shall be made on personal knowledge.... Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or by further affidavits.
B. When a motion for summary judgment is made and supported as provided above, an adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. [Emphasis supplied.]
The trial court specifically struck exhibits "I" and "J," which are unsworn, ex parte statements taken from the police officers by the homicide division of the Baton Rouge City Police after Parker's death.
[7] This quote is borrowed from Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).
[8] Salazar v. City of Chicago, 940 F.2d 233, 242 (7 Cir.1991).
[9] Even conceding what the police found was true, there was simply not enough evidence to establish Parker lacked capacity to refuse transportation to the hospital. One is presumed capable of entering into contracts and executing waivers, and the party asserting incapability has the burden of establishing same. See Emerson v. Shirley, 188 La. 196, 208, 175 So. 909, 913 (1937). In the instant case, there was insufficient evidence to refute the presumption of capability.
[10] In Greek mythology, Scylla was a sea monster who lived in a cave and devoured sailors; Charybdis was a dangerous whirlpool off the Sicilian coast, opposite the cave of Scylla.
[11] Paramedic Champlin testified Berthier's examination of Parker was more thorough than required or than would usually be performed given Parker's apparent condition because Berthier was instructing the EMT student on the performance of an examination.