986 So.2d 821 (2008)
I-20 CORRIDOR PROPERTIES, LLC, Plaintiff-Appellant
v.
MAHONY TITLE SERVICES, LLC, Defendant-Appellee.
No. 43,260-CA.
Court of Appeal of Louisiana, Second Circuit.
June 4, 2008.
*822 Joe D. Guerriero, Monroe, for Appellant.
Lawrence & Associates, by John S. Lawrence, Jr., Mandeville, Deutsch, Kerrigan & Stiles, L.L.P., by Robert Kerrigan, Jr., Kermit L. Roux, III, Arthur Stewart, Isaac H. Ryan, New Orleans, for Appellee.
Before WILLIAMS, STEWART and CARAWAY, JJ.
CARAWAY, J.
The defendant title company successfully moved for summary judgment after plaintiff sued for damages in connection with its attempted purchase of commercial real estate under an oral contract. Defendant was hired by plaintiff's prospective vendor to handle two closings that occurred on the same day. In the first transaction, plaintiff's prospective vendor acquired the property, and then in the second transaction, plaintiff was to have been the ultimate purchaser. Instead, plaintiff asserts that defendant refused to close the sale to plaintiff, and plaintiff's prospective vendor sold the property that day to another entity. The defendant closed both sales, and plaintiff, which had a representative present at the defendant's offices with funds for the purchase, was excluded from acquiring the property. Defendant's motion for summary judgment accepted the factual allegations of plaintiff, asserting that plaintiff had stated no cause of action in contract, tort or otherwise against it. Because we agree with the trial court that the law imposes no duty on the defendant title company under the facts of this case, the judgment of the trial court is affirmed.

Facts
This action involves a May 2005 real estate closing of back-to-back sales transactions involving a 15.827-acre tract of immovable property located in East Baton Rouge Parish. More than six months before the closing, the original property owner, Resources for Senior Living, LLC, ("RSL"), and the prospective buyer, American Capital, Inc. ("ACI") executed a contract of sale. The agreement, dated October 14, 2004, provided a sales price of $1,750,000, an initial 90 day inspection period followed by a second 90 day period, with the closing to occur by the end of the cumulative 180 days, at "the office of Buyer's attorney, or such other location as the parties hereto may mutually hereafter agree." The contract also provided that the $25,000 cash deposit ACI tendered to RSL's agent/broker was refundable only during the initial inspection period.
Vicki M. Spurlock ("Spurlock") acted as listing agent and RSL's broker, apparently on behalf of Locations Real Estate, the brokerage identified in the written contract between RSL and ACI. Spurlock dealt with ACI's representative, Charles Theus ("Theus"). The time within which performance was due under the contract was briefly extended to Friday, May 3, 2005, in consideration of an additional $25,000 payment by ACI.
*823 ACI, through Theus, began looking for an "investor" to fund the entire $1,750,000 purchase price for the property. Theus testified as follows concerning ACI's proposal to Ed Hakim, one of the principals of I-20 Corridor Properties, Inc. ("I-20").
A. I contact Mr. Hakim. I use several people as, I guess, my backers; Billy McConnell being one, Eddie Hakim being another. When you  when you talk about  you start talking with local people that can close and would close. So, I called Eddie to see if he had any interest in that particular site in Baton Rouge, Burbank and Bluebonnet. He told me that he would like me to bring him some paperwork and bring him the  the plan, what I thought it would do. I did. We met at his office. He told me he would get back with me. About two days later, maybe a week, he called me up and said, "Look, Charles, meet me at my office." I did. He said, "I'm in." He said, "I like the site." From my recollection, he sent someone, or he did himself, to go down to look at the  inspect the site. I know for sure David Moses went down.
Q. Does David Moses work for one of Eddie Hakim's businesses?
A. Yes.
Q. Okay.
A. David Moses and Tony Little went down to inspect the site and to see what I purported. Eddie  Eddie called me up and said, "Fine." You know, "Everything is fine. We're in."
Q. When you say "we're in," do you know what he meant by that?
A. He said that he would finance the site and he would buy the site, and he would let me develop the site for him.
Q. And did you agree to do that?
A. Yes.
This "handshake" deal[1] between ACI and I-20 as described above envisioned ACI purchasing the property from RSL and immediately selling the tract to I-20 for the same purchase price of $1,750,000. After this agreement, Theus selected Mahony Title Services, L.L.C. ("Mahony") as the closing agent. Theus testified in his deposition that he had a good working relationship with Denise Strobel, an employee at Mahony's Monroe office, and he took the written contract between RSL and ACI to Strobel.
In preparation for the closing on May 3, 2005, Strobel distributed a HUD-1 settlement statement to I-20's representative, Ed Hakim, as Theus instructed her. That afternoon, Theus arrived at Mahony's office before Joseph Hakim, and was advised by Denise Strobel that Spurlock also had a prospective buyer for the property, Bustec, L.L.C. ("Bustec"). According to Theus's deposition, Strobel asked him "who do you want to close with?"
I-20 cites further testimony of Theus for the opposing view that ACI was forced to close with Bustec under pressure from Spurlock and Strobel. According to Theus, they told him that if he did not sell to Bustec, they were not going to close the initial sale from RSL, and ACI would forfeit its $50,000 down payment. Theus described this as "an economic gun ... to my head." Theus insisted that he "wanted to close with Hakim (I-20)." Yet, Strobel expressed to Theus her dislike for the Hakims. I-20 argues, and for the purpose of this summary judgment the evidence suggests, that Spurlock's real estate fee and Mahony's closing commission were the *824 reasons they refused to close the sale between ACI and I-20. Joseph Hakim, who represented I-20 at the closing, had already made it clear to Strobel that he did not want to purchase any title insurance to be issued by Mahony for I-20's purchase of the property.
Later that same afternoon, ACI conveyed title to the property it had just acquired from RSL to Bustec pursuant to a buy/sell agreement executed contemporaneously therewith. Theus signed the contract while Spurlock signed it as Bustec's agent. Strobel notarized the contract. The sales price was $2,100,000.[2]
One month later, on June 3, 2005, I-20 sued Mahony for damages in connection with its "lost purchase" of the East Baton Rouge Parish property. In 2007 after much discovery, Mahony moved for summary judgment, accepting as true all of the allegations of I-20's petition. No evidence was otherwise offered in support of the motion. I-20 opposed Mahony's motion by filing numerous depositions of the parties to the closing.
In written reasons, the trial court granted Mahony's summary judgment and dismissed I-20's suit. It is from this judgment that I-20 appeals.

Discussion
In bringing this appeal, I-20 expressly rejects any assertion of a claim for tortious interference with contract because of the narrow allowance for such claim under the Louisiana Supreme Court decision in 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989).[3] The contract central to this dispute, the existence of which Theus arguably admitted under oath in his deposition, was the alleged oral contract to sell between ACI and I-20. Although this contract and the anticipated sale of the property to I-20 were allegedly thwarted by Mahony's actions at the time of the closing, I-20 agrees that it has no actionable claim for tortious interference with these contracts.
Instead, citing our general tort principle under Civil Code Article 2315 and certain jurisprudence from other states, I-20 claims that Mahony breached its duty of supervision as a closing agent in this case. It further claims that Mahony's duty was that of a fiduciary that extended for the protection of I-20 even though the record is clear that ACI, not I-20, chose to engage Mahony to handle the closing of the two transfers of the real estate that were to occur on May 3, 2005. I-20 cites no authority suggesting that a statutory duty existed upon Mahony that prevented Mahony from refusing to close the sale to I-20.
What is more specific in our law is the law pertaining to notaries, and this should be considered since the employees of Mahony were to act with notarial capacity to complete the closing. Those employees were not attorneys which might call into question the duties attendant to an attorney-client relationship. In Roth v. B & L Enterprises, Inc., 420 So.2d 1094 (La. 1982), the Louisiana Supreme Court had occasion to address the actions of a notary who received the proceeds of the sale which he closed and who then absconded with the funds. The court cited La. R.S. 35:2 for the notary's primary statutory *825 powers "to make conveyances" and "to receive acknowledgments of instruments under private signature." The court noted that the notary to a sale may receive funds not in his official capacity, "but rather as a trusted individual." Id. at 1096. This would be the notary's contractual undertaking to either the vendor, vendee, or both parties. The supreme court concluded in Roth that since the vendor had agreed to the notary's receipt of the sales proceeds, the risk of loss was to be borne by the vendor. Nothing in the Roth ruling suggests that the notary involved in the closing has a fiduciary duty imposed upon him, as now argued by I-20.
A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath. La. C.C. art. 1839. An option, right of first refusal, or contract to sell that involves immovable property is effective against third persons only from the time the instrument that contains it is filed for registry in the parish where the immovable is located. La. C.C. art. 2629.
The facts as alleged and shown in the discovery depositions reveal that ACI hired Mahony to handle the closing of two simultaneous sales transactions. Among other things, Mahony's basic duties were to prepare and have executed the two deeds and to receive the sales prices in some form of verified or certified funds into its escrow account for the protection of the two sellers. Some or all of the cash sale proceeds that ACI would receive in the second sales transaction from I-20 (or in actuality, Bustec) would flow through this account and serve as the cash sale proceeds that were to be delivered to the seller in the first transaction, RSL. In other words, ACI, according to Theus, did not have the "financing" to acquire the property from RSL unless ACI could immediately receive and direct the cash sale proceeds from its sale to pay RSL.
From these facts, the major point which I-20's argument ignores is the role of ACI in this dispute. ACI engaged the services of Mahony, not I-20. It is difficult to have any duty flowing from Mahony to I-20 when ACI alone contracted for Mahony's services. Mahony never acted as a notary to close a sale between ACI and I-20, so that the duties owed by the notary discussed above ever materialized. ACI also arrived at the closing as the only party with a written contract allowing for the acquisition of the immovable property. ACI alone had a binding contract to obtain title and then in turn, to choose to sell the property to another party. I-20 had no written purchase contract from ACI. Such a written contract to sell recorded in the public records prior to May 3, 2005, would have protected I-20 from the sale by ACI to Bustec. La. C.C. art. 2629. In the absence of these legal protections afforded purchasers of immovable property, I-20 was subject to the whims of ACI and its agent, Theus, regarding the real estate transactions which occurred on May 3.
Theus signed the deed for ACI in favor of Bustec. Theus chose to receive the $2,100,000 purchase price from Bustec instead of the $1,750,000 from I-20. Mahony, and indeed Spurlock, may have encouraged Theus to sell to Bustec, or even insisted that that sale occur to the detriment of I-20. Nevertheless, the certified check and other available funds which I-20 had available at the closing to complete its purchase of the property from ACI could have been directed by Theus to serve as ACI's "financing" for its purchase from RSL. The evidence shows that Theus was no stranger to commercial real estate closings, *826 and the large profit he realized in selecting Bustec over I-20 was hardly an economic gun to his head. ACI's role in choosing to dishonor its oral commitment to sell to I-20 is the cause of I-20's loss. Once that oral purchase contract was admitted under oath by Theus, I-20's action for recovery of its damages could then be directed against ACI.
In view of the legal protections already afforded I-20, its lack of a contract with Mahony, and the breach of contract by ACI, we will not turn to our general tort law and place a duty upon Mahony for its actions in this matter.[4] Without a contractual relationship between the parties or other obligation imposed by law upon Mahony, I-20's claim for breach of a fiduciary relationship is likewise unfounded. In reaching this conclusion, like the granting of an exception of no cause of action, we accept the most favorable version of the facts argued by I-20, yet affirm the motion for summary judgment dismissing the suit.

Conclusion
For the above reasons, the judgment of the trial court is affirmed. Costs of the appeal are assessed to appellant.
AFFIRMED.
NOTES
[1] It is undisputed that the contract between ACI and I-20 was never memorialized in writing.
[2] The actual deed from ACI to Bustec is not in the record.
[3] The 9 to 5 Fashions, Inc. ruling recognized only a corporate officer's duty to refrain from intentional and unjustified interference with a contractual relationship between his employer and a third person. Healthcare Management Services, Inc. v. Vantage Healthplan, Inc., 32,523 (La.App. 2d Cir. 12/8/99), 748 So.2d 580. That situation is not present in this case.
[4] The element of duty in our duty-risk analysis for negligence is a question of law for the court. Lemann v. Essen Lane Daiquiris, Inc., XXXX-XXXX (La.3/10/06), 923 So.2d 627.