NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 12-611

ERNEST AND IRENE LEE

VERSUS

COURTNEY JOHN RHODES, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 45055
HONORABLE LEO BOOTHE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JIMMIE C. PETERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, J. David Painter, and James T. Genovese, Judges.

REVERSED AND RENDERED.

Jack Forsythe Owens Jr.
Owens & Lemke, Inc.
P. O. Box 595
Harrisonburg, LA 71340
(318) 744-5431
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Ernest and Irene Lee

**John B. Hoychick**
**Cotton, Bolton, Hoychick & Doughty, LLP**
**P. O. Box 857**
**Rayville, LA 71269**
**(318) 728-2051**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Courtney John Rhodes**
    **Michael Rhodes**
    **James Vidrine**

**PETERS, J.**

The plaintiffs, Ernest and Irene Lee, brought suit against Courtney John Rhodes, Michael Rhodes, and James Vidrine to recover damages for the wrongful death of their son, Michael Ernest Lee. The defendants appeal a trial court judgment awarding the plaintiffs monetary damages. For the following reasons, we reverse the trial court judgment and render in favor of the defendants, rejecting the plaintiffs' claims for damages.

## DISCUSSION OF THE RECORD

Michael Ernest Lee died on the evening of November 26, 2008, after a rural Concordia Parish, Louisiana physical altercation involving the defendants. His body was ultimately transferred to the Jefferson Parish Forensic Center ("Forensic Center") in Harvey, Louisiana, where, on December 1, 2008, Dr. Karen Ross, a board-certified forensic pathologist associated with the Forensic Center, performed an autopsy on Mr. Lee. Her autopsy report, as well as her subsequent testimony, established numerous conclusions concerning Mr. Lee's physical condition at the time of his death, but did not identify with any degree of certainty the specific cause of death. Still, the underlying facts giving rise to this litigation are not at issue.

Mr. Lee was a life-long resident of Concordia Parish with a history of drug and alcohol abuse. The Concordia Parish Sheriff's Office (Sheriff's Office) was well aware of his drug and alcohol abuse history, but still used Mr. Lee on occasion as a confidential informant in criminal investigations. In fact, the background activities leading up to his death on the evening of November 26, 2008, began earlier that morning when Mr. Lee effected a meeting with his personal contact at the Sheriff's Office, Deputy David Kenneth Hedrick, Jr.

At approximately 11:00 a.m. on November 26, 2008, Mr. Lee appeared at Deputy Hedrick's office in the Concordia Parish Courthouse Annex, claiming to have information concerning the location of generators which had recently been stolen. The deputy accompanied Mr. Lee on a fruitless two-hour search around the Ferriday, Louisiana area looking for an individual whom Mr. Lee identified as being involved in the theft of the generators. During the search, Deputy Hedrick drove Mr. Lee's vehicle.[1] Over that two-hour period, Deputy Hedrick observed nothing out of the ordinary with Mr. Lee's behavior other than when Mr. Lee returned to the vehicle after one stop, he had an odor of alcohol on his breath.

Deputy Hedrick returned to his paperwork at the courthouse annex, but had not seen the last of Mr. Lee on that day. At approximately 3:00 p.m., he observed Mr. Lee approaching his office again and decided not to answer the knock on his door. However, Mr. Lee refused to be ignored. He began to beat on the door and, when Deputy Hedrick continued to ignore him, attempted to remove a screen from a window. When Deputy Hedrick finally answered the door, Mr. Lee insisted that he knew the location of the individual they had searched for that morning.

Mr. Lee and Deputy Hedrick again got into Mr. Lee's vehicle, but this time with Mr. Lee driving. However, instead of leaving the courthouse area, Mr. Lee made a fast loop through the parking lot and stopped the vehicle in the back of the courthouse. He then turned to Deputy Hedrick and informed him that "You're going to have to whip my ass before we go get these generators." In response to this aggressive behavior, and believing that Mr. Lee intended to fight him, Deputy Hedrick exited the vehicle and walked to the driver's side where Mr. Lee met him and, after pushing him in the chest, struck him in the jaw. Deputy Hedrick then

---

[1] Deputy Hedrick did not explain why he choose to be the driver, but the record does establish that Mr. Lee had no driver's license, having had it suspended for driving while intoxicated offenses.

struck Mr. Lee in the head, causing him to fall to the ground. Mr. Lee's personality immediately changed from aggressive to passive, and he began apologizing profusely for his behavior. Because of his long-time friendship with Mr. Lee,[2] Deputy Hedrick did not immediately arrest him for a violation of La.R.S. 14:34.2, battery on a police officer. Instead, he accepted the apology, reentered the vehicle, and instructed Mr. Lee to drop him off at his office.

Once Deputy Hendrick reentered the truck, Mr. Lee's aggressive behavior resurfaced and he simply drove past the deputy's office and started to exit the parking lot. As he continued to drive, he insisted to Deputy Hedrick that they were going to retrieve the stolen generators. When Mr. Lee allowed the vehicle to slow down for a brief moment, Deputy Hedrick recognized that the situation was quickly deteriorating and exited the vehicle. When the deputy began to walk toward his office, Mr. Lee turned the vehicle around and began following him.

By this time, the events unfolding in the parking lot drew the attention of other deputies who came to Deputy Hedrick's assistance. Deputies Bobby Sheppard, Eddie Poole, and Danny Merrill all testified to a cut on Mr. Lee's forehead and hand, and that Mr. Lee appeared to be intoxicated. The deputies did not arrest Mr. Lee for a violation of La.R.S. 14:98, driving while intoxicated. Instead, one of the supervisors instructed Deputy Merrill to drive Mr. Lee to his home in the Shaw community (Shaw) of Concordia Parish.[3]

Deputy Merrill left the Sheriff's office with Mr. Lee at approximately 4:00 p.m., and stayed with him for approximately one and one-half hours at his home,

---

[2] Deputy Hedrick testified that he known Mr. Lee most of his life.

[3] The Shaw community is in southern Concordia Parish. The various witnesses testified to driving times from the courthouse to Mr. Lee's home from twenty minutes to one hour, but the general consensus was that the trip took about thirty minutes.

or until Deputy Mike Clark brought Mr. Lee's vehicle to the Shaw community.[4] Because Deputy Clark was not sure where Mr. Lee's home was located, the three men met at a location familiar to Deputy Clark. There Deputy Merrill gave Mr. Lee his keys and the two officers left him and his vehicle at that location.

Mr. Lee did not return home. Instead, he started traveling around the Shaw community and became involved in minor altercations before arriving, in an extremely intoxicated condition,[5] at the defendants' hunting camp. Sixty-eight-year-old Michael J. Rhodes, hereinafter referred to as "Mr. Rhodes" to distinguish him from his son and codefendant, Courtney John Rhodes ("Mr. Courtney Rhodes"), was in the front yard of the camp cooking dinner on a bar-b-que pit when Mr. Lee drove his vehicle into the yard, cut a doughnut, and stopped within a few feet of the him and the pit. Mr. Rhodes testified that initially Mr. Lee was incoherent and screaming belligerently. Mr. Rhodes quickly came to understand, however, that Mr. Lee's profanity laced diatribe communicated his intent to burn their camp. When he instructed Mr. Lee to leave, Mr. Lee began spinning the vehicle in the yard.

By this time both Mr. Courtney Rhodes and James Code Vidrine (Mr. Courtney Rhodes' brother-in-law) had exited the camp building and joined Mr. Rhodes in the front yard. None of the defendants knew Mr. Lee before this incident, and their first introduction to him was when he began screaming that no one could protect the three men, and he was going to kill them and burn the camp. At this point, Mr. Courtney Rhodes dialed what was the first of a number of 911

---

[4] The time periods testified to by the various officers in relation to the events in which they were involved were rough estimates as none of the officers, including those who were involved in the subsequent investigation of Mr. Lee's death, took copious notes.

[5] As a result of the autopsy performed by Dr. Ross, Mr. Lee's blood alcohol concentration content was set at 0.252 grams of alcohol per one cubic centimeters of blood.

calls for assistance. When he handed the cellular telephone to his father, the operator answered immediately. Mr. Rhodes attempted to explain the situation and then turned the telephone toward Mr. Lee who screamed his intentions into the cellular telephone. The 911 operator responded to Mr. Rhodes that she had heard Mr. Lee's outbursts. As Mr. Rhodes attempted to give the operator some information concerning Mr. Lee's vehicle, Mr. Lee exited the vehicle and continued to verbally assault the three men. Mr. Rhodes observed a wound on Mr. Lee's left forehead and blood on his hands. According to Mr. Rhodes, Mr. Lee's eyes had the look of a hysterical maniac.

Within seconds after exiting the vehicle, Mr. Lee stated that "the killing was about to begin" and struck Mr. Courtney Rhodes in the right eye with his fist. He then grabbed Mr. Courtney Rhodes by the throat, and the two men fell to the ground with Mr. Lee on top. Mr. Rhodes and Mr. Vidrine came to Mr. Courtney Rhodes' assistance, and the two men were finally able to extricate Mr. Courtney Rhodes from under Mr. Lee and pin Mr. Lee to the ground on his stomach.

The three men worked at holding Mr. Lee under control for approximately twenty to twenty-five minutes during which time they continued to call 911 for assistance. During this initial period, Mr. Lee struggled violently with the three men and continued to curse and threaten them. In their efforts to keep Mr. Lee pinned down, Mr. Courtney Rhodes kept pressure on his upper back, Mr. Rhodes sat on his buttocks, and Mr. Vidrine sat on his feet to keep him from kicking Mr. Rhodes. The three men found Mr. Lee to be exceptionally strong. In fact, Mr. Rhodes suggested that he exhibited "superhuman strength," and at times, Mr. Lee would lift all three men from the ground in an effort to get up.

Initially, Mr. Rhodes, who suffered from a heart condition, degenerative bone disease, and deteriorating nerves in both legs, held Mr. Lee's left arm in an

5

effort to keep him from hitting his son and to maintain some degree of control over their assailant. Mr. Rhodes suggested that the situation was no less than holding "a tiger by the tail." At some point, he found the strength in his left arm leaving him, and in an effort to maintain the advantage he had holding the left arm, he found a piece of rope, wrapped it around Mr. Lee's left arm, and used this for leverage in maintaining control.

After Mr. Lee began to tire, the three men were able to relax somewhat. However, every few minutes Mr. Lee would regain his strength, and the altercation would begin anew and would last until he would tire again. Finally, Mr. Lee became so exhausted that Mr. Rhodes was able to hold him to the ground simply by sitting on his buttocks. Mr. Courtney Rhodes remained close and would put pressure on Mr. Lee's back and shoulders when he seemed to regain his wind and attempt to renew the conflict. This scenario continued during the next twenty to twenty-five minutes before Deputy Dennis Cowan arrived in response to the second or third of the many 911 calls made by the three men. Until moments before Deputy Cowan arrived, Mr. Lee alternated between requesting to be released, and cursing and threatening the three men who were holding him.

When Deputy Cowan arrived, he found Mr. Lee laying on his stomach in the yard with Mr. Rhodes sitting on his buttocks and Mr. Courtney Rhodes kneeling beside him. Apparently having had experience with Mr. Lee, Deputy Cowan instructed Mr. Rhodes to remain sitting on Mr. Lee's buttocks until he could place leg restraints on him for control purposes. As he placed the leg restraints on Mr. Lee, he noticed that Mr. Lee responded by moving his right leg a small distance. However, after placing Mr. Lee in leg restraints and turning to place handcuffs on his wrists, Deputy Cowan observed that Mr. Lee appeared to have stopped breathing. Deputy Cowan called for an ambulance and performed CPR on Mr.

6

Lee for approximately forty minutes until the ambulance arrived. Mr. Lee did not respond and was pronounced dead sometime after being placed in the care of the ambulance crew.

Dr. Ross performed the autopsy at the request of the Concordia Parish Coroner, and summarized her findings in her written report as follows:

> It is my opinion that Michael Lee, a 39 year old white male died as a result of arteriosclerotic cardiovascular disease following a physical struggle. It is my further opinion that chronic obstructive pulmonary disease and chronic alcoholism may have contributed to his demise. A component of positional asphyxia cannot be completely excluded; however, he had evidence of severe heart disease including ischemic necrosis. While blunt force injuries were noted including a thin linear non-displaced fracture of the left orbital frontal plate of the skull and slight subdural hemorrhage, there is no discernible mass affect or brain injury produced from these injuries and investigative information provides that the decedent remained conscience and combative for some time after the injuries were likely sustained. The manner of death is classified as undetermined.

Dr. Ross testified that Mr. Lee's coronary artery atherosclerosis caused a seventy-five percent narrowing of his blood vessels. Additionally, she found that his heart was significantly enlarged.[6] According to Dr. Ross, hypertension caused the enlarged condition of Mr. Lee's heart, and the size made it electrically unstable. She testified that his condition is a normal finding in one who is a heavy alcohol drinker. The autopsy revealed that Mr. Lee's blood alcohol concentration was 0.197 percent when tested in the blood and 0.252 percent when tested in the vitreous fluid. According to Dr. Ross, the higher number was the more accurate figure which placed Mr. Lee in excess of three times the legal limit for operating a vehicle while intoxicated as set forth in La.R.S. 14:98(1)(b).

Dr. Ross concluded that none of Mr. Lee's internal problems related to trauma, and she strongly felt that the defendants' actions did not contribute to his

---

[6] According to Dr. Ross, a normal heart would weigh between 400 and 450 grams. Mr. Lee's heart weighed 540 grams.

death. She described a homicide as a situation when someone else causes a death, whether intentional or unintentional. This event, according to Dr. Ross, was not a homicide. In fact, she suggested that with his health difficulties, it would not have been unusual for him to have died instantly while walking out of his house.

On November 24, 2009, Mr. Lee's parents, Ernest and Irene Lee, brought this wrongful death suit, naming Courtney John Rhodes, Michael Rhodes, and James Vidrine as defendants. The matter was tried as a bench trial on November 14, 2011, and before the beginning of the evidentiary phase of the trial, the plaintiffs stipulated that their individual damages did not exceed $50,000.00.

At the close of evidence, the trial court took the matter under advisement. On March 12, 2012, the trial court executed a judgment awarding the plaintiffs $125,000.00 in damages and finding the plaintiffs and defendants equally at fault in causing Mr. Lee's death. The trial court gave no reasons for its judgment.

The defendants timely perfected this appeal wherein they assert the following assignments of error:

A. The trial court committed manifest error by assessing the appellants with fifty percent (50%) fault.

B. The trial court manifestly erred in presumably finding the appellants' action caused Lee's death.

C. The trial court committed manifest error by awarding more than $100,000.00 in damages.

**OPINON**

This is a fact intensive case, and it is well settled that, pursuant to the manifest error standard of review, a trial court's findings of fact will not be set aside in the absence of manifest error or unless they are clearly wrong. *Rossell v. ESCO*, 549 So.2d 840 (La.1989); *Stobart v. Dept. though DOTD*, 617 So.2d 880 (La.1993). In order for a reviewing court to reverse a factfinder's factual

8

determinations, the reviewing court must find that a reasonable factual basis does not exist in the record for the finding and that the record establishes that the finding is clearly wrong or manifestly erroneous. *Stobart*, 617 So.2d 880. In reversing the trial court judgment and rendering judgment in favor of the defendants dismissing the plaintiffs' claims against them, we need only consider the second assignment of error to find no rational basis of fact in the record to support the trial court's judgment.

Louisiana Civil Code Article 2315(A) provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." In their petition, the plaintiffs did not suggest that the defendants intentionally injured Mr. Lee, or that he was not the aggressor in the physical altercation of November 26, 2008. Instead, they asserted that the defendants used "excessive physical force to restrain Mr. Lee and hold him till[sic] law enforcement arrived to remove Mr. Lee from the property." Thus, in this matter, the alleged fault on the part of the defendants is in the form of negligence.

> Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty/risk analysis, which entails five separate elements: (1) whether the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) whether the defendant's conduct failed to conform to the appropriate standard (the breach element; (3) whether the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) whether the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) whether the plaintiff was damaged (the damages element).

*Hanks v. Entergy Corp.*, 06-477, pp. 20-21, (La. 12/18/06), 944 So.2d 564, 579.

A plaintiff's failure to establish any of these elements by a preponderance of the evidence will preclude his or her right of recovery.

As stated in *Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095, p. 8 (La. 3/10/06), 923 So.2d 627, 633, "[a] threshold issue in any negligence action is

9

whether the defendant owed the plaintiff a duty." Additionally, "[w]hether a duty is owed is a question of law." *Id.* In the matter now before us, Mr. Lee was clearly the aggressor, and the defendants were entitled to defend themselves. To that end, and in the criminal context, La.R.S. 14:19(A) provides in pertinent part that:

> The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.

Thus, in defending themselves from Mr. Lee's unprovoked attack, the plaintiffs had a duty to use only force that was reasonable and apparently necessary to prevent the offense. That being the case, the first element of the duty/risk analysis is satisfied in this matter.[7]

Turning to the second element of the duty/risk analysis, we do not find that the defendants breached the duty imposed on them in defending themselves from Mr. Lee's unprovoked attack. In fact, the evidence is overwhelming in favor of the defendants on this point. They were confronted with an obviously extremely intoxicated stranger whose only communication with them was a threat of death to them and danger to their property. When asked to leave their property, he not only refused to do so, but escalated the confrontation by exiting his vehicle and committing a battery on Mr. Courtney Rhodes. The defendants used only the force necessary to maintain control of Mr. Lee until law enforcement officials arrived. Both Deputy Cowan and Deputy Sheppard, who arrived later to investigate the incident, testified that the defendants did nothing wrong in attempting to keep Mr.

---

[7] The fact that Mr. Lee died in the altercation does not preclude the application of La.R.S. 14:19(A) because, as previously noted, Dr. Ross concluded that his death was not a homicide.

Lee under control. They both concluded that the defendants did the best they could in defending themselves, given the circumstances.

Having found that the plaintiffs failed to establish by a preponderance of the evidence that the defendants breached any duty they owed to Mr. Lee arising from the confrontation, we will not address the remaining elements of the duty/risk analysis. Additionally, we need not consider the remaining assignments of error asserted by the defendants.

## DISPOSITION

We reverse the trial court judgment rendered in favor of Ernest Lee and Irene Lee, and against Courtney John Rhodes, Michael Rhodes, and James Vidrine. We render judgment in favor of Courtney John Rhodes, Michael Rhodes, and James Vidrine, and against Ernest Lee and Irene Lee, dismissing their suit. We assess all costs of the trial and appeal to Ernest Lee and Irene Lee.

**REVERSED AND RENDERED**.

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2—16.3.