PETERS, J.,
dissenting.
liThe plaintiff brought this personal injury suit, individually and as the tutor of her minor daughter, to recover from the Lafayette Parish School Board (School Board) for the damages she and her daughter are alleged to have incurred as a result of her daughter’s decision to walk home from school on the afternoon of November 4, 2004. She claims that while walking home from the Lafayette Middle School in Lafayette, Louisiana, on that date, her daughter was sexually assaulted by an unknown assailant. The plaintiff appeals the trial court’s rejection of her claims against the School Board, and the majority proposes to reverse that determination, although there is no majority on any liability issue other than the end result.
I disagree with the plurality’s interpretation of the factual record as well as most of the legal analysis found in the four opinions written by the three judges who form the plurality. It naturally follows that I also disagree with the award of any damages to the plaintiff. Because the plurality agrees only on the result reached and not on the methodology applied in reaching that result, my dissent cannot be based on one or two points of disagreement. Instead, I find it necessaiy to set forth the particulars of the entire record in order to explain why I believe that the analysis and result is wrong in all four opinions.
| ^STANDARD OF REVIEW
Because of the way in which the plurality reaches the decision to reverse, in discussing the standard of review applicable, we should remind ourselves that Louisiana is unique in that courts of appeal review both law and facts. La. Const, art. 5, § 10(B). Furthermore, it is well established that a trial court’s findings of fact are subject to the manifest error/clearly wrong standard of review. Stobati v. State, Through DOTD, 617 So.2d 880 (La.1993). “[T]he issue to be resolved by a reviewing court is not *628 whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.” Id. at 882. In that regard, “where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Specifically, “[i]n applying the manifestly erroneous— clearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.” Id. The credibility determinations of the trier of fact are subject to the strictest deference under the manifest error/cleariy wrong standard. Theriot v. Lasseigne, 93-2661 (La.7/5/94); 640 So.2d 1305. An independent de novo review by the appellate court is proper only “[w]here one or more trial court legal errors interdict the fact-finding process” and “the record is otherwise complete.” Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747.
All four opinions simply accept as fact the assertions of the plaintiff and her daughter and ignore the trial judge’s factual findings. Thus, the plurality disregards this long-established standard of review that appellate courts are required to apply. _JjThis failure to apply the appropriate standard of review results in decisions not supported by the law or the jurisprudence.
LAW PERTAINING TO NEGLIGENCE ACTIONS IN GENERAL
Questions of liability for negligent acts are evaluated using a duty-risk analysis. Daye v. Gen. Motors Corp., 97-1653 (La.9/9/98), 720 So.2d 654. Under the duty-risk approach, the “[pjlaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant and the risk of harm was within the scope of protection afforded by the duty breached.” Id. at 659. The plaintiffs failure to prove any of the elements of the duty-risk analysis results in a determination of no liability. Lemann v. Essen Lane Daiquiris, Inc., 05-1095 (La.3/10/06), 923 So.2d 627. The duty analysis is a legal rather than factual one and is the threshold issue in any negligence action. Id. Cause-in-fact is a factual question to be determined by the factfinder and subject to the manifest error standard of review. Benjamin ex rel. Benjamin v. Hous. Auth. of New Orleans, 04-1058 (La.12/1/04), 893 So.2d 1.
Again, as was the case in considering the scope of review, none of the plurality mention the duty-risk analysis. However, application of this analysis to the evidence presented mandates an affirmation.
DUTY IMPOSED ON THE SCHOOL BOARD
The duty imposed on a school board with regard to children in their care is a long-established rule of “reasonable supervision.” Wallmuth v. Rapides Parish Sch. Bd., 01-1779, 01-1780, p. 8 (La.4/3/02), 813 So.2d 341, 346. That “reasonable supervision” duty is governed by one of two Civil Code articles: either by [4La.Civ.Code art. 2320[1] or La.Civ.Code art. 2315. The latter article provides that “[ejvery act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” Our supreme court has held *629 that “liability under each statute requires that the School Board breach its duty of reasonable supervision over its students.” Wallmuth, 813 So.2d at 347. In that opinion, the supreme court stated that the correct standard of liability under either La.Civ.Code art. 2320 or La.Civ.Code art. 2315 is as follows:
A school board, through its agents and teachers, owes a duty of reasonable supervision over students. The supervision required is reasonable, competent supervision appropriate to the age of the children and the attendant circumstances. This duty does not make the school board the insurer of the safety of the children. Constant supervision of all students is not possible nor required for educators to discharge their duty to provide adequate supervision.
Before liability can be imposed upon a school board for failure to adequately supervise the safety of students, there must be proof of negligence in providing supervision and also proof of a causal connection between the lack of supervision and the accident.... Furthermore, before a school board can be found to have breached the duty to adequately supervise the safety of students, the risk of unreasonable injury must be foreseeable, constructively or actually known, and preventable if a requisite degree of supervision had been exercised.
Id. at 346 (citations omitted).
Thus, the duty we must analyze in this matter is whether the School Board provided reasonable supervision to the plaintiffs daughter in proportion with the daughter’s age and the accompanying circumstances.
The record establishes that the Lafayette Middle School effected notice of a child’s required participation in Behavior Clinic through written notice to the child and an automated telephone call to the child’s home the night before his or her ^participation in the Behavior Clinic. Additionally, it has a policy that no child will be left alone on campus at the end of the day. To that end, the principal’s office remains open after school to afford any child access to a telephone to call for transportation. In fact, the office is only locked when the janitor — the last person to leave the campus in the afternoon— locks it as he leaves for the day. Although the policy concerning the use of the tutoring student bus is somewhat muddled, the evidence is uncontradicted that a public bus stop is located directly in front of the school. Finally, every teacher or administrator who testified on the “no child left on campus” policy made it clear that, when necessary, children would be transported home by teachers or other responsible adults and, if necessary, would be given money for public transportation. It is these policies that are subject to our review.
Despite the plurality’s statement to the contrary, the jurisprudence contains no decision that is remotely factually similar to this matter. The general rule in this court has been that allowing a student to leave the campus during regular school hours in violation of the school’s established policy is a violation of the duty of reasonable supervision. Peters v. Allen Parish Sch. Bd., 08-323 (La.App. 3 Cir. 11/5/08), 996 So.2d 1230 and D.C. v. St. Landry Parish Sch. Bd., 00-1304 (La.App. 3 Cir. 3/7/01), 802 So.2d 19, writ denied, 01-981 (La.5/25/01), 793 So.2d 169.[2] Courts have *630 also held that the duty of reasonable supervision includes preventing a six-year-old from leaving the school grounds unattended at the end of the school day. Sutton v. Duplessis, 584 So.2d 362 (La.App. 4 Cir.1991) and Gary on Behalf of Gary v. Meche, 626 So.2d 901 (La.App. 3 Cir.1993). However, the duty of reasonable supervision changes as the student grow older. This court has held that a school board is not required to ensure that a nine-year-old student who is walking home after an extracurricular activity does not leave the school grounds alone. Jackson v. Colvin, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, writ denied 99-228 (La.3/19/99), 740 So.2d 117. Additionally, this court has held that the duty of reasonable supervision does not include preventing an eleven-year-old sixth grade student who is supposed to ride the bus from walking home. Domingue v. Lafayette Parish Sch. Bd., 03-895 (La.App. 3 Cir. 6/16/04), 879 So.2d 288, writ denied 04-1803 (La.10/29/04), 885 So.2d 588. In Domingue this court distinguished Sutton and Gary, stating that “[t]he level of supervision required for six-year-olds versus eleven and twelve-year-olds cannot be compared.” Id. at 296.
Without saying as much, two of the judges in the plurality would make school boards the insurer of the safety of every child; overrule the holdings in Wallmuth, Jackson, and Domingue; and expand the holdings of Peters and D.C.
FACTUAL ANALYSIS
In this case, the plurality points to no legal error on the part of the trial court that would have interdicted the fact-finding process, yet all three judges seem to perform a de novo review of the record. The result is that none of the three judges gives any deference to the trial court’s findings of fact, much less the strict deference required by the jurisprudence under the manifest error/clearly wrong standard of review. The starting point of any appellate review is a review of the factual findings of the trial court. The four plurality opinions simply skip this step, accept as fact thejjtestimony of C.C., the plaintiffs daughter, and conclude that there are no disputed facts in this litigation. I respectfully disagree with the review procedure applied as well as the conclusion reached.
What is not disputed is that during the 2004-2005 school term, the Lafayette Middle School operated both a tutoring program and a disciplinary program after school on Tuesdays and Thursdays. C.C., who is the plaintiffs daughter, was a regular participant in the tutoring program and a sometimes participant in the disciplinary program known as the Behavior Clinic. Both programs began immediately after the end of the school day[3] and lasted until around 4:00 p.m. The Lafayette Middle School provided a full-sized school bus to take the tutoring program children home, but, as a general rule, the Behavior Clinic children were instructed that they could not ride this bus.'[4] Instead, they were required to make transportation arrangements in advance of their Behavior Clinic *631 participation or immediately after the Behavior Clinic.
It is also undisputed that, on Tuesday, November 4, 2004, C.C. participated in the Behavior Clinic rather than the tutoring program. She was familiar with the program, having already been required to attend twice that school year.[5] Although she knew she would be required to participate that afternoon, she made no mention of participation to her mother as she left home that morning. Her mother had received notification of C.C.’s participation in the Behavior Clinic by the automated telephone call on both occasions in the past and had made arrangements to pick up her daughter Ron each occasion. On the afternoon of November 4, 2004, the plaintiff did not pick up her daughter, nor did she make arrangements for her daughter to be picked up by a responsible party.
The record also establishes that after the Behavior Clinic, C.C. left the campus with a fellow student, S.R.C., and walked to a nearby Popeyes fast food establishment. S.R.C. left C.C. at Popeyes and caught a city bus to travel to her home. Sometime thereafter, C.C. had a sexual encounter with someone.[6] It is this sexual encounter that constitutes the basis for the plaintiffs claim for damages. The remainder of the facts surrounding the happenings on the afternoon of November 4, 2004, are in dispute.

Factual Record Relative to Telephone Access

On appeal, the plaintiffs theory for the School Board’s liability hinges primarily on the argument that C.C. was unable to use the school telephone in the principal’s office to call home because the door to the office was locked, and that Gladys Marie Reed, the Behavior Clinic supervising teacher, denied C.C.’s subsequent request to use her [Ms. Reed’s] personal cellular telephone to call home. In its reasons for judgment, the trial court concluded factually that “[t]he evidence is overwhelming that ... the use of a telephone was made available to the juvenile on the day in question.” In its reasons for judgment, the trial court also concluded factually that “[s]tudents were also questioned and confirmed the phone could be accessed.” In reaching these factual conclusion, the trial court made credibility determinations on the issue of telephone availability and resolved this issue in favor of the School Board.
|9In her lead opinion, Judge Cooks does not mention the trial court’s factual conclusions on this issue. Instead, she accepts C.C.’s testimony as fact and concludes C.C. established that no telephone was available to her on the afternoon of November 4, 2004.[7] My review of the record reveals that the other testimony overwhelmingly supports the trial court’s factual determination on this issue and that Judge Cooks erred in not giving the proper deference to the trial court’s factual findings on this issue and in replacing the well-reasoned factual determinations of the trial court with her own.
C.C. testified that immediately after the Behavior Clinic, she went to the principal’s *632 office on the first floor of the school to telephone her mother, but when she reached the office, she found the office door locked. According to C.C., she returned to the Behavior Clinic room, which is located on the third floor of the school, to ask Ms. Reed for the use of Ms. Reed’s cellular telephone to call her mother. She testified that Ms. Reed refused to allow her to use the telephone and she then went outside and met with her friend, S.R.C. Although the tutoring student school bus was still in front of the school, she walked with S.R.C. to a nearby Popeyes fast food establishment.
C.C.’s testimony was the only evidence presented by the plaintiff on this pivotal issue of the availability of a telephone. In response, the School Board called a number of witnesses who disputed C.C.’s version of the facts on this issue. However, Judge Cooks does not mention this testimony, discounting its significance with the comment that “[a] careful review of the testimony of witnesses called by the | ]nschool board discloses that none of these witnesses can directly contradict C.C.’s testimony that the office door was locked when she attempted to open it to use the phone.” Judge Cooks hypothesizes that
[W]hen C.C. approached the office the doors were closed. When questioned on cross examination by defense counsel, C.C. clearly equates “closed” with locked. No attempt by either defense or plaintiffs counsel was made to explore exactly what C.C. did to assure that the office doors were in fact locked. It is just as reasonable to find based on C.C.’s testimony examined in whole is that she saw the doors closed and believed the doors were locked.
This hypothesis is not supported by C.C.’s actual testimony. On cross-examination, the only questioning concerning the office doors reads as follows:
Q And you told us that the doors were closed.
C.C. That’s right. They were locked.
Q Did yon check both doors?
C.C. Yes.
Q Who was with you when you checked the doors?
C.C. I was by myself.
(Emphasis added.)
C.C.’s testimony unequivocally established that she physically checked the doors and found them locked. Absent any evidence other than C.C.’s testimony, Judge Cook’s hypothesis would still be incorrect. Further, the School Board’s evidence on this issue clearly discounts the hypothesis as the following summary of that evidence establishes.
Ms. Reed, a twenty-four-year educator, testified that at the end of each Behavior Clinic session, she requires all the participating students to properly stack the material they have been working on, instructs them to exit the building but not to use the bathroom or get water,[8] and instructs them to use the telephone in the office | n immediately before leaving the building if needed. According to Ms. Reed, the principal’s office is open after dismissal of the Behavior Clinic to accommodate those students who must make arrangements for transportation. She affirmatively testified that the office was open on November 4, 2004, stating that as she left the building, she observed several children using the telephone in the principal’s office. When she left the premises approximately ten minutes later, the tutoring bus was still parked in front of the school and there were still children waiting for rides. However, she did not see C.C.[9]
*633 Ms. Reed specifically denied that C.C. ever asked to use her cellular telephone, and testified that had C.C. asked, she would certainly have allowed her to telephone her mother. In fact, according to Ms. Reed, a few days after this incident, C.C. apologized for having lied to others about Ms. Reed’s alleged denial of the use of her cellular telephone.
Christopher Ferrill, a twelve-year educator, testified that after school on November 4, 2004, he made a number of copies at the office near the principal’s office and observed that the principal’s office was open. In fact, during that afternoon, he used the office telephone to call his wife and was around the office when the tutoring and Behavior Clinic classes ended. Additionally, he testified that the office is always open until the janitors lock the building after everyone has left. Although his time-line is inconsistent with the timing for the end of the tutoring classes and Behavior Clinic (Mr. Ferrill testified that he made the copies between 3:00 p.m. and 3:20 p.m.) Ms. Reed testified that she observed Mr. Ferrill making the copies as she left the building. His testimony, coupled with Ms. Reed’s observation of his presence after the Behavior |12Clinic students were released, gives credibility to a finding that he was present later than 3:20 p.m. and simply was incorrect in his time-line testimony.
Monique Boute McGee, a thirteen-year educator and the Assistant Principal at Lafayette Middle School, testified that C.C. came to her two days after the incident at issue and told her that she never asked Ms. Reed for the use of her cellular telephone. Ms. McGee is the person who called Ms. Reed in to accept C.C.’s apology. Although Ms. McGee was not present at school after 3:00 p.m. on November 4, 2004, she testified that the principal’s office is open every day until the janitor locks up, and that the telephone is available to the students staying after school. On November 5, 2004, after hearing of the alleged attack on C.C., Ms. McGee questioned a number of the Behavior Clinic students who were present the day before and found no complaints concerning the use of the telephone.
Brenda Faye Billedeaux, a thirty-seven-year educator and the Behavior Discipline Center facilitator, testified that on November 4, 2004, the Behavior Clinic ended at 4:00 p.m. and the tutoring sessions ended at 4:15 p.m. At approximately 3:55 p.m., Ms. Billedeaux went through the principal’s office and made an afternoon announcement, then left out of the front door to the office to ensure that the door was propped open and the phone on the counter. She subsequently observed a number of students using the telephone. On that day, she was on the campus until 4:35 p.m., waiting for another student to be picked up.
Ronald Pollan, a thirty-five-year educator and the Principal at Lafayette Middle School, testified that it is school policy for the principal’s office to remain open in the afternoon after school to allow children stranded on campus to telephone for transportation. While he was not present on the afternoon of November 4, 2004, he | ^conducted interviews with other students on November 5, 2004, and found no evidence to suggest that the policy was not followed on the day before.
Randy Fitzgerald Andrus, the custodian or janitor on duty on November 4, 2004, testified that he generally remains on campus from 9:00 a.m. until 6:00 p.m., he checks the building to make sure everyone has left, he then locks the office and the building, and he is the last to leave each day. According to Mr. Andrus, this procedure was in effect on November 4, 2004, *634 and the office was open that afternoon after school until he left for the day.
S.R.C. acknowledged in her testimony that Ms. Reed dismissed the class just as Ms. Reed had explained in her testimony. S.R.C. specifically remembered Ms. Reed instructing any student who needed to call a parent to go directly to the office. She recalled the door to the office being open, the school secretary being present in the office, and other students using the office telephone.[10]
The end result of Judge Cook’s analysis is to discount the trial court’s factual finding on this issue by accepting C.C.’s testimony as accurate and questioning the veracity of the professional educators who have a combined 121 years of teaching experience, as well as that of Mr. Andrus, who is the individual responsible for inspecting the building at the end of the day. Such a determination ignores the clear preponderance of the evidence and, more importantly, ignores the manifest error/clearly wrong standard of review.
As previously stated, both Judge Saunders and Judge Gremillion disagree with Judge Cooks on this pivotal issue. Judge Saunders concludes that “the record suggests that [C.C.] could have used a phone to call her mother for a ride.” Judge Gremillion Instates that he agrees “with the trial court conclusion that this twelve-year-old girl certainly had access to at least one telephone before she left the school grounds.” In' fact, in this regard, Judge Gremillion goes on to say that “[tjhere is no one to blame but her for her failure to call someone.”

Factual Record Relative to Bus Service

In its reasons for judgment, the trial court factually concluded that “[t]he evidence is overwhelming that transportation was available through bus service.” The three plurality judges do not mention the trial court’s factual determination on this issue. Instead, they simply conclude that C.C. could not ride the tutoring student bus, and, therefore, the School Board failed to provide transportation. However, this conclusion is not supported by the record and ignores the trial court’s factual determination that even if C.C. did not ride the tutoring student bus, public bus service was also available to her.
I do agree that Lafayette Middle School’s policy concerning the use of the tutoring student bus was, as suggested by the trial court in its reasons for judgment, “confusing” given its application. In fact, I would go further and suggest that it was ill conceived and should be changed for the future.
Ms. Billedeaux admitted to being the architect of this policy, asserting that it was put in place to guarantee the tutoring students a ride home, but not to totally deny the Behavior Clinic children a ride. She testified that after all tutoring students were accommodated, the remaining space on the bus was provided to the Behavior Clinic students. However, she acknowledged that the policy was not articulated to the students in that fashion, and that an announcement was made to the effect that Behavior Clinic students were not allowed to ride the bus. She suggested that part of | lfithe intent of the stated policy was to make it plain to the Behavior Clinic students that she was not obligated to find them a way home and, thus, transportation difficulties would be a part of their punishment for breaking the rules.
*635 Given the mixed signals from the school administration, I would agree with the plurality opinions that one could conclude that C.C. understood she could not ride the tutoring student bus. However, the trial court did not base its factual conclusion on the tutoring student bus alone. The reasons for judgment conclude that “transportation was available through bus service.” (emphasis added). What the plurality ignores is that public transportation was available. Furthermore, the remainder of the evidence overwhelmingly establishes that a child in need of a ride would be accommodated regardless of Ms. Bille-deaux’s communicated policy or the availability of public bus transportation.
Ms. Reed testified that any transportation problem would always be addressed, and that she had driven children home in the past. Additionally, she made it clear that a teacher is always present until every student has left the campus. Mr. Fer-rill testified that he had helped children find transportation in the past, and had driven some home as well. Ms. McGee was not even aware of the problem with the tutoring student bus and made it clear that children would be accommodated, as did Ms. Billedeaux. In fact, Ms. Bille-deaux testified that not only had she brought children home personally, but that the school personnel had enlisted the help of local law enforcement officers to provide transportation in some instances. Mr. Pol-lan confirmed the testimony of the other teachers, and both he and Ms. Billedeaux testified that because C.C. was a regular tutoring student she had the right to ride the tutoring student bus even though 116she was attending the Behavior Clinic rather than tutoring class on November 4, 2004. According to Mr. Pollan, a student is never left stranded on campus.
The testimony of Peter A. Arceneaux, the driver of the tutoring student bus, supported the stated school policy that, when space is available, no Behavior Clinic student would be denied a ride on his bus. According to Mr. Arceneaux, the only thing the school wished to do with its stated denial policy was to require the Behavior Clinic students to attempt to contact their parents first. If that failed, the bus was available. Mr. Arceneaux testified that space was available on November 4, 2004.
The most damaging testimony to the plaintiffs case is that of S.R.C. She established without question that there was a city bus stop directly in front of the school. She was familiar with this fact because she normally caught the public bus at that stop after school. Additionally, although C.C. claimed in her testimony to have no money, Mr. Pollan testified that, in support of the school policy that no child would be left on campus, the office or one of the teachers would have provided her with money to take the public transportation offered.
The evidence is also clear that even after she left the campus, C.C. had access to transportation. C.C. testified that when she left campus with S.R.C., she knew that 5.R.C. had only fifty cents, and that was required for her ride home. Yet, C.C. also testified that when they arrived at Po-peyes, S.R.C. purchased food and somehow still had fifty cents to ride the bus. However, S.R.C. did not support C.C.’s testimony on her lack of money. S.R.C. testified that, not only did she have adequate money to purchase food at Popeyes and ride the public bus, she had enough to loan C.C. the bus fare and offered to do so. According to S.R.C., C.C. responded that she wanted to “wait” at Popeyes. S.R.S. indicated that she did not know what C.C. was waiting for.
117Both Judge Cooks and Judge Saunders limit their analysis of the transportation issue to the use of the tutoring student bus. In doing so, they conclude that *636 the Lafayette Middle School policy in this regal'd violates the School Board’s duty under La.R.S. 17:158 to provide free bus transportation to children living more than one mile from the school. Judge Cooks suggests that this statute somehow changes the School Board’s duty from one of “reasonable supervision” to one of a “high burden of responsibility,” a requirement not heretofore recognized by statute or jurisprudence. Specifically, Judge Cooks holds that “[w]hen the school chose to institute a policy contrary to the statutory requirement of free transportation it assumed a high burden of responsibility to ensure that any child denied such transportation has an alternate safe means of getting home.” Judge Saunders finds that La.R.S. 17:158 imposes a duty on the School Board to provide students with transportation home and that this duty “encompasses the risk of C.C. being raped while walking home.”
Both Judge Cooks and Judge Saunders ignore the trial court’s factual finding that numerous alternate means of arriving-home safely were available to C.C. Furthermore, they misapply the statute. Louisiana Revised Statutes 17:158 does require that a school board provide free transportation to students living more than one mile from the school, but does not create a duty for a school board to insure a child’s safe return home. Our supreme court has held that the violation of a statute gives rise to civil liability only when “the prohibition in the statute is designed to protect from the harm or damage which ensues from its violation.” Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714, 717 (1972). Louisiana Revised Statutes 17:158 is an accommodation statute, not a safety statute. It is not designed to prevent the injury or assault of students when they leave the school; rather, it is designed to do just what it | 18says — -provide free transportation for schoolchildren who live more than a mile away from the school. “Louisiana has a long-standing recognition of the right of elementary and secondary students and their parents to a free education and that included within that concept is the right to free transportation to and from school.” Moreau v. Avoyelles Parish Sch. Bd., 04-1613, p. 4 (La.App. 3 Cir. 3/9/05), 897 So.2d 875, 880, writs denied 05-910 (La.6/17/05), 904 So.2d 704 and 05-997 (La.6/17/05), 904 So.2d 705.
In asserting liability under this statute, Judge Cooks and Judge Saunders rely on the first paragraph of the statute and ignore a subsequent provision in the statute, which makes it clear that the penalty for violation of the duty imposed is not one in tort, but reimbursement to the parents of the child denied bus transportation for the expenses of alternate transportation. La. R.S. 17:158(C). Even then, the reimbursement is not to exceed $125.00 per student, or $350.00 per family. Id. Furthermore, while the statute does not specifically say as much, its purpose is to provide transportation to and from school before and after regular school hours. This interpretation is supported by other statutory provisions. For example, the legislature has specified that a school is not required to provide transportation for students who have been reassigned to attend a different school after being accused of battery or assault on any school employee, La.R.S. 17:416(l)(vii)(dd), or for students who have been suspended or expelled from school and reassigned to an alternative education program, La.R.S. 17:416.2(E), if providing transportation for the pupil will result in additional costs to the school system.
Were Judges Cooks’ and Saunders’ interpretation of La.R.S. 17:158 to stand, school boards would be required to mandate that all students living more than one mile hsfrom school ride the school buses provided or find themselves liable for every accident that might occur between home and the school. This would make all *637 school boards the insurer of the safety of children between home and school — a duty clearly rejected by the supreme court in Wallmuth, 813 So.2d 341. Of greater concern is that Judge Cooks and Judge Saunders do not limit their opinions to mandated after-school activities. Instead, they would require school boards to provide transportation for all students participating in after-school activities, mandated or voluntary, or else somehow ensure the students have “an alternate safe means of getting home.” Such an approach was rejected by this court in Domingue, 879 So.2d at 295, wherein it considered that under the facts of that case, it doubted that “anything short of an impossible system, that would require a roll-call of every student exiting the school, taking into account students who may have left school earlier in the day and who are involved in an ever-changing series of after-school events, would have been an effective deterrent” to preventing a student from being injured on his walk home.[11]
The record establishes that the Lafayette Middle School adhered to its policy of making sure that no child would be left on campus by having telephone access, making available other means of transportation, and by providing an on-campus procedure to make sure that everyone has left the campus before locking it down. The trial court considered the evidence presented to it, made credibility determinations, and concluded that the School Board, through its agents at the Lafayette Middle School, did not violate the reasonable supervision duty it owed to C.C. I agree with that judgment and would end the litigation at this point, finding no breach of duty. | gpHowever, I find it necessary to address the other issues raised by the various plurality opinions.

Duty-Risk Analysis

After the plurality failed to apply the manifest error standard of review, it confounded this error by ignoring the duty-risk analysis. In fact, even assuming that the School Board breached a duty by prohibiting C.C. from riding the tutoring students’ bus (an assumption not supported by the record), that fact alone does not end the inquiry. The next step in the duty/risk analysis is to determine whether that breach was a cause-in-fact of her resulting harm — a step which the plurality never addressed. Judge Saunders’ decision begins and ends with the analysis of the application of La.R.S. 17:158. Had Judge Cooks and Judge Gremillion applied the duty-risk analysis on a step-by-step basis, I believe they would have reached a different conclusion. The record is clear that the action or inaction of the school officials at Lafayette Middle School was not a cause-in-fact of whatever harm C.C. may have incurred on her way home. The simple fact is that C.C. had no intention of telephoning her mother or seeking transportation at school. As her own testimony establishes, long before the Behavior Clinic was over she had already decided to go to Popeyes with S.R.C. when released from school. The following testimony by C.C. makes her plans crystal clear:
Q When did you find out that [S.R.C.] was not taking the school bus?
C.C. When we were in B.C. [Behavior Clinic].
Q What did she tell you?
C.C. She said she was going to Popeyes and then taking a bus.
Q She was going to catch the City bus from Popeyes?
C.C. Yes.
Q Was it then that you decided to go with her?
C.C. Yes.
Q Y’all are in B.C. and you decide: Pm going to go home with her and go to Popeye’s anyway.
J21C.C. I decided to ask her how she was gonna get home and she told me that — she asked me if I could walk with her and I said “Okay.”
Q And that was in the B.C. class?
C.C. Yes.
Q Before it was over?
C.C. Yes.
*638 Judge Cooks suggests in a footnote that “[although the Board argues that the girls devised a plan earlier in that day to walk home from school there is no evidence in the record to support this position.” While other testimony by C.C. attempts to modify the testimony cited above, it is incorrect to say that the record is devoid of evidence on this point. Judge Gremil-lion’s concurrence falls into the same error, stating “[t]his is not ... a case where this young lady simply chose to walk home instead of riding the school bus.” In making this conelusory statement, he ignores the record before us.
Other testimony from C.C. supports a finding that C.C. had no intention of riding the bus or calling her mother. For example, C.C. testified that she did not remind her mother that she had Behavior Clinic when she left for school on the morning of November 4, 2004, because she assumed her mother had received the automated telephone call the night before. However, C.C. also testified that her mother did not receive a phone call from the school that night. At still another point she testified that on the two other times she had attended the Behavior Clinic, she used a friend’s cell phone to call her mother from school and tell her mother that she had the Behavior Clinic and needed to be picked up. Further, she testified that when the Behavior Clinic let out at the end of the day, she immediately went to the office to call her mother without even checking outside to see if she was present. This certainly raises a question of why she needed to use the telephone without knowing whether or not her mother was present. Additionally, after she allegedly found the office door flocked (a fact disputed by everyone else who testified on this point) and requested to use Ms. Reed’s cellular telephone (a fact disputed by Ms. Reed), she immediately joined S.R.C. and left the campus. Finally, she acknowledged that she had used the office telephone in the past, and that it had always been available.
Again, a proper application of the manifest error standard of review at this point would require that we affirm the trial court judgment without going further. That is to say, the plaintiff failed to prove that any breach of its duty by the School Board was a cause-in-fact of C.C.’s alleged injuries. Lemann, 923 So.2d 627.

Proof of a Tortious Act

The trial court did not reach the rape issue because of its conclusion that the School Board breached no duty owed to C.C. However, the trial court gave us some guidance concerning its leanings on this issue when it stated in the reasons for judgment that “the testimony of Deputy Lebreton along with other factors does provide evidence to support” a finding contrary to C.C.’s rape allegations. The plurality opinions do not even consider the evidence on this critical element of proof. They simply ignore the record and assume that the sexual assault occurred as testified to by C.C.
I must agree with the trial court that the plaintiff did not establish that C.C. was sexually assaulted.[12] The problem with the proof presented on this issue is that C.C. articulated four different versions of what occurred.
Her first version was told to Lafayette City Police Officer and Juvenile Crimes Investigator Guy Joseph Lebreton, who investigated C.C.’s complaint. He was *639 [¡^dispatched to the hospital on the evening of November 4, 2004, after the initial responding officer determined the nature of the alleged offense. According to Officer Lebreton, when he first spoke with C.C., she told him that a man came up behind her, choked her, and pulled her into a wooded area where she “fell asleep” — a comment which he interpreted to mean that she was choked unconscious. She then informed him that she awoke fully clothed and with her books and belongings beside her. According to Officer Lebre-ton, C.C. said that she told her grandmother first, and then her mother.[13]
Officer Lebreton found C.C.’s attitude during the initial interview to be “very unusual as far as trauma victims go,” in that she seemed very unconcerned with what had happened. He also found it strange that C.C. was “smiling” during the vaginal examination by the emergency room physician. Additionally, although C.C. had told him that she had been choked and had been punched twice by her assailant, he observed no injury whatsoever to her face and neck. Furthermore, while he would have expected to see grass stains or rips on her clothing, the clothing reflected no signs of a struggle. Officer Lebreton then traveled to the location of the alleged assault, found no signs of a straggle, and, in fact, found no wooded area.[14]
The second version of the alleged assault was given to Officer Lebreton the next day, when he met with C.C. and her mother at the Lafayette City Police station. He again observed no bruises or abrasions on C.C.’s face or neck that could be considered evidence of a straggle. C.C.’s description of her assailant changed drastically in this interview and, when asked how she could explain having awakened fully clothed, C.C. [^changed her story to say that she was undressed and had put her clothes back on. When Officer Lebreton commented about the lack of bruises, C.C. then stated that she had been approached by a male in a vehicle, abducted, and thrown in the back seat of the vehicle. Later in the interview, C.C. told the officer that she had been raped in a motel room several blocks from the initial crime scene, not in the wooded area as originally stated.
At some point in the investigation, C.C. told Officer Lebreton that she knew her assailant frequently stayed at the motel and that on the morning of November 4, 2004, she had seen him at the car wash near where she claimed to have been abducted. Officer Lebreton suggested that this knowledge raised “kind of flags for me because now she’s providing knowledge about his social habits and where he hangs out and where he stays at night. Uncommon for a, you know, anonymous victim, anonymous suspect relationship.” Officer Lebreton went to the motel and inspected the registration logs for the day of the incident as well as prior days and found no information to support C.C.’s story.
After two photographic lineups proved unhelpful, Officer Lebreton pressed C.C. for other information. C.C. continued to say that she was taken to the motel, but provided the officer with the name of “Curt or Curtis,” who she claimed was known to her aunt, who drove a white vehicle, and who frequented a homeless shelter on the opposite side of Lafayette. *640 The officer spoke with the aunt, who denied any knowledge of such a person.
At this point in the investigation, Officer Lebreton began to suspect that C.C. had a relationship with the person with whom she had sex. He met with S.J. and informed her that he could do nothing more until she and C.C. were able to “come to lasóme terms about what happened and present it to me up front and honestly.” When nothing new arose within the next two weeks, he suspended the investigation. This occurred in the latter part of November of 2004, and no one was ever charged with the alleged sexual assault.
S.R.C. testified to a third version of the encounter. She testified that C.C. told her that “somebody had attacked her into a ditch and hit her upside the head with a brick.” S.R.C. added other food for thought when she testified that C.C. had a “boyfriend” although she did not know his name. Additionally, she testified that C.C. never explained what or who she was waiting for when S.R.C. left C.C. at Popeyes.
C.C. testified at trial to a fourth version: that she was grabbed on the street within two minutes of leaving Popeyes by a man who approached her from the front as he walked toward her on the sidewalk adjacent to the street. She testified that she and her assailant then engaged in a fist fight as she straggled to get away, and that he ultimately knocked her unconscious. She then testified that when she awoke, she found herself in the nearby woods with her clothes from her waist down removed. Realizing that she had been raped, she returned to the street, retrieved her purse and books, which were still lying next to the street, and walked home. When she arrived at home, she informed her mother that she had been raped and her mother telephoned the police. According to C.C., the other injury she sustained in addition to the rape and its consequences was a black eye.
Even assuming a breach of duty by the School Board, not every sexual encounter would cause the School Board liability. It was the plaintiffs burden to prove that C.C. was sexually assaulted and the nature of that sexual assault. While C.C. may have been the victim of a sexual assault, the different versions of what 12Hoccurred, as provided by C.C., did not reach the threshold of proof by a preponderance of the evidence. The plaintiffs failure to prove by a preponderance of the evidence the actual nature of the sexual encounter also results in a failure to prove an element of the duty-risk analysis and mandates a determination of no liability on the School Board’s part. Lemann, 923 So.2d 627.

Areas of Disagreement in the Legal Analgsis of the Pluralitg

I have already addressed my disagreement with Judge Cooks’ and Judge Grem-illion’s reliance on D.C. v. St. Landry Parish School Board, 802 So.2d 19, as well as Judge Cooks’ and Judge Saunders’ reliance on La.R.S. 17:158. The other principle disagreement I have with the plurality’s legal analysis centers around Judge Cooks’ reliance on the supreme court’s prior decision in this matter as reported as S.J. v. Lafayette Parish School Board, 06-2862 (La.6/29/07), 959 So.2d 884. In citing this opinion, Judge Cooks quotes the factual statements made in Justice Johnson’s concurring opinion as if these facts had been established after a trial. Justice Johnson was not faced with a factual record based on a trial on the merits when she rendered her opinion, but was reviewing issues raised by a motion for summary judgment. When a reviewing court considers a district court’s grant of summary judgment, it must view the record and all reasonable inferences that may be drawn *641 from that record in the light most favorable to the non-movant — in this case, the plaintiff. Hines v. Garrett, 04-806 (La.6/25/04), 876 So.2d 764. “In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party’s favor.” Id. at 765. Thus, it was appropriate for the supreme court, when reviewing the trial court’s 127grant of summary judgment in favor of the School Board, to accept as true all the allegations in S.J.’s petition, without weighing the limited evidence then before it.
While Justice Johnson begins her concurring opinion[15] by titling the first section therein as “FACTS AND PROCEDURAL HISTORY,” she made it clear that credibility calls are not appropriate in a summary judgment analysis, and concluded that summary judgment in this matter was not appropriate because there were genuine issues of material fact remaining in the litigation. The matter is now before us after a trial on the merits and the prior supreme court holding in this matter is of no help in our analysis because the standard of review has changed. We are now bound by the manifest error standard and must give great deference to the trial court because it, after hearing all of the evidence and observing the demean- or of the witnesses, was in the best position to determine the credibility of the various witnesses and what weight should be given to their testimony. It made those determinations, obviously choosing to discredit C.C.’s uncorroborated testimony and instead believe the testimony given by all the other witnesses at trial.
SUMMARY
The plurality’s positions on the legal and factual issues are not unanimous, and a summary of the various positions make that extremely clear.
• Judges Saunders and Gremillion recognize the School Board’s duty as that of reasonable supervision while Judge Cooks suggests that in this case, the School Board has an enhanced duty of supervision.
|2s* Judges Saunders and Gremillion agree that there is no manifest error in the trial court’s factual finding that a telephone was available to C.C. at school. Judge Cooks concludes otherwise.
• Judges Cooks and Saunders conclude that the School Board’s failure to provide school bus transportation to C.C. after Behavior Clinic violates the requirements of La.R.S. 17:158, thereby creating a cause of action in tort. Judge Gremillion disagrees with this conclusion. None of the three even consider the trial court’s factual determination that other transportation was available to C.C.
• Judges Saunders and Gremillion agree as to quantum and the percentages of fault while Judge Cooks disagrees. Judge Cooks would award significantly more in damages and would decrease C.C.’s degree of fault.
• All three ignore the manifest error standard of review and fail to perform a duty-risk analysis, particularly in relation to cause-in-fact.
*642 This case is not complicated. The principal issue is whether the trial court correctly found that the School Board did not breach its duty of reasonable supervision and I find no error, legal or factual, in the trial court’s determination. I would affirm.

. Louisiana Civil Code Article 2320 relates to the liability of a school board for the damage caused by their students, and is not applicable to the matter now before us.

. Judges Cooks and Gremillion suggest that the D.C. decision supports their position. Having written that decision, I can say that it is clearly distinguishable. In that case, the school allowed a twelve-year-old seventh grade student to check herself out of school during school hours, in violation of its own policy, and without notifying the parents. The *630 child was sexually molested while walking home. In finding liability in that case, this court clearly distinguished that case from Jackson v. Colvin, 98-182 (La.App. 3 Cir. 12/23/98), 732 So.2d 530, writ denied 99-228 (La.3/19/99), 740 So.2d 117, where a child was struck by a vehicle while walking home after attending an after-school activity. In Jackson, this court had applied the long-established rule that school boards are not the insurers of the children in their care.

. The evidence presented establishes that the regular school day concluded at 2:15 p.m.

. This ill-conceived policy will be discussed more fully later in this dissent.

. In fact, her participation on November 4, 2004, was a makeup session because she had failed to attend the Behavior Clinic the week before.

. The presence of semen in C.C.’s vagina makes this fact undisputable. However, that fact alone does not establish the nature of this sexual encounter.

. Both Judge Saunders and Judge Gremillion disagree with Judge Cooks on this issue. Thus, four of the five judges on this panel agree that the trial court did not err in concluding that C.C. did have access to a telephone to call her mother for transportation.

. Ms. Reed indicated this instruction was to facilitate the children leaving the building rather than congregating in the bathroom or around the water cooler.

. Ms. Reed testified that C.C. and S.R.C. were the first to leave tlie Behavior Clinic.

. When questioned concerning the presence of the secretary and other students using the telephone, S.R.C. stated "I think so.” However, she was clear that the office door was open.

. As previously stated, Domingue, 879 So.2d at 295, was the case where this court held that the duty of reasonable supervision does not include preventing an eleven-year-old sixth grade student who is supposed to ride the bus from walking home.

. This conclusion should not be construed as a belief on my part that a crime was not committed. Sexual intercourse involving C.C., with or without her consent, is a criminal offense. Still, not every sexual encounter involving C.C. would cause the School Board to incur liability.

. The plaintiff testified that when C.C. told her of the incident, she (the plaintiff) telephoned the grandmother.

. The closest thing to a wooded area observed by Officer Lebreton was a line of bushes along a fence with a clearance of approximately two to three feet between the bushes and the fence.

. It bears noting that the opinion was not unanimous. It was released as a five-judge per curiam opinion, with [now] Chief Justice Kimball, Justice Johnson, Justice Traylor, and Justice Weimer forming the majority. Chief Justice Kimball and Justice Traylor joined in tire written reasons authored by Justice Weimer, and Justice Johnson wrote separately. Justice Knoll dissented with reasons, and Justice Victory dissented without reasons.