United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 6, 2004**

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

No. 04-30002
Summary Calendar

UNITED STATES FIRE INSURANCE COMPANY,

Plaintiff-Appellee,

VERSUS

KERSHIA MILLER; ET AL.,

Defendants,

LIBERTY SERVICES, INC.; LOUISIANA WORKERS' COMPENSATION CORPORATION,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana
N° 02-CV-1828-R

Before SMITH, BARKSDALE, and DEMOSS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Defendants Liberty Services, Inc. ("Liberty"), and Louisiana Workers' Compensation Corporation ("LWCC") appeal a judgment for plaintiff United States Fire Insurance Company ("United States Fire") granting partial summary judgment. The district court concluded that LWCC is liable for half of the workers' compensation payments made by United States Fire on behalf of employer Seacor Marine ("Seacor") to Roger Dyson pursuant to LA. REV. STAT. § 23:1031(C). LWCC and Liberty appeal on the ground that Dyson was not a borrowed employee of Liberty and that Liberty (*via* its workers' compensation carrier, LWCC) should not be liable for subrogation. In light of the facts offered by each party, and applying the ten-part test in *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969), we conclude that Dyson was a "borrowed employee" of Liberty, so we affirm.

## I.

In June 2001, Dyson was injured when a car driven by defendant Kershia Miller crossed the median and struck the vehicle Dyson was driving. On the day of the accident, Dyson was working at the Liberty work site and was en route to pick up time sheets for Liberty's off-shore employees. There is no dispute that Dyson was acting within the course and scope of his employment when the accident occurred.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Dyson then filed a claim for workers' compensation benefits through his nominal employer, Seacor, which then requested coverage from its workers' compensation carrier, United States Fire, and United States Fire began to make medical and disability payments to Dyson.

At the time of the accident, Seacor owned two-thirds of Energy Logistics, Inc. ("ELI"), which, in turn, owned 100 percent of Liberty. ELI acquired Liberty in 1999 with the financing of Seacor. Before the acquisition, Dyson was on the payroll of Baker Energy (the minority owner of ELI). After the acquisition, Dyson was moved to Seacor's payroll and was assigned the Liberty truck he was driving when the accident occurred. Dyson conducted most of his work in an office trailer on Liberty's work site and supervised thirteen Liberty employees.

Factual disputes between the parties arise at this point. United States Fire argues Dyson was the borrowed employee of Liberty, but Liberty and LWCC maintain Dyson's employer was Seacor or ELI.

## II.

Using diversity jurisdiction, United States Fire sued Liberty and LWCC for recovery of workers' compensation benefits paid on behalf of Dyson. After discovery, United States Fire moved for partial summary judgment, seeking to resolve the legal liability of Liberty and LWCC, leaving at issue the question of damages. United States Fire argued that Dyson was a "borrowed employee" of Liberty's at the time of the accident. Under LA. REV. STAT. § 23:1031(C), if United States Fire establishes that Dyson was a borrowed employee, United States Fire is entitled to seek contribution for one-half of the amount of workers'

compensation benefits it has paid. *See Travelers Ins. Co. v. Paramount Drilling Co.*, 395 So. 2d 849, 851-52 (La. App. 2d Cir. 1981). The district court granted the motion, finding that Dyson was a borrowed or special employee of Liberty at the time of the accident.

III.

A.

Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The moving party, in this case United States Fire, bears the burden of establishing that there are no genuine issues of material fact. In determining whether there is a fact issue, evidence and inferences must be drawn in the light most favorable to the non-moving party. *Daniels v. City of Arlington, Tex.*, 246 F.3d 502 (5th Cir. 2001). We review a summary judgment *de novo*. *Meditrust Fin. Serv. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999).

B.

The district court held that the evidence presented by the parties overwhelmingly favored the finding that Dyson was a borrowed employee of Liberty, thereby entitling United States Fire to subrogation from LWCC. The court reached this decision by applying the ten-factor test used by Louisiana courts and this court. *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969). These ten factors are:

(1) Who has the right of control over the employee beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished the tools and the place of performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

(10) Who selects the employee?

Although no single factor is determinative, this court has historically considered the fifth, eighth, ninth, and tenth factors to be the most essential. *Gaudet v. Exxon Corp.*, 562 F.2d 351, 356 (5th Cir. 1977). The district court found that all but the ninth factor were resolved in favor of United States Fire and granted its motion accordingly.

Liberty and LWCC argue that none of the ten factors can be resolved in favor of United States Fire. Liberty and LWCC doggedly maintain that Dyson was an employee of Seacor or, in the alternative, ELI. Liberty also contends that it had only tangential contact with Dyson at the time of the accident. Application of the admittedly convoluted facts to the *Ruiz* test demonstrates that the district court correctly concluded that Dyson was Lib-

3

erty's borrowed employee.

### 1.

The first factor is who has the right of control over the employee. The district court notes that in the accident report, Liberty describes Dyson as its "leased employee from Seacor," which indicates that Liberty initially claimed responsibility or control over Dyson. Liberty and LWCC object to the court's reliance on this fact, however, charging that this is the only bit of evidence that would suggest that Dyson was under Liberty's control.

This is not the case. Both parties acknowledge that Dyson was under the direct control of Butch Guidry, the operations manager for ELI and Liberty, who was in turn directly under Joe Sarne, the president of both. Liberty and LWCC aver that Guidry was an employee of Seacor, but Guidry's deposition indicates that although his paycheck came from Seacor, all his duties were with ELI and Liberty. Though Dyson may not have been under the supervision of Liberty's vice president Richard Johnston, the only people who could be considered his supervisors were officers of ELI and LibertySSnot SeacorSSthus suggesting that ultimate control over Dyson's work lay in Liberty's hands, not Seacor's.

### 2.

The second factor examines whose work was being performed by the employee in question. Evidence suggests unequivocally that Dyson performed all his work for Liberty and not for Seacor.

Dyson was driving Liberty's vehicle so that he might run an errand for Liberty. Liberty owned and operated the shore-based facility where Dyson supervised the thirteen Liberty employees and maintained his office. Dyson was reimbursed for various office, travel, and entertainment expenses by Liberty.

Liberty and LWCC contend that Dyson's work was performed in furtherance of ELI, as the sole owner of Liberty. Naturally, any work done by any employee of Liberty would be to the benefit of the intermediate holding company (and, by extension, the parent corporation, Seacor), and to argue that ELI was the real employer simply because of this is, essentially, a semantic attempt to confuse.

Evidence plainly demonstrates that Dyson's work *directly* benefited Liberty, which thereby *indirectly* helped ELI. To reason that ELI was the sole beneficiary of Dyson's work contravenes the evidence and ignores the fact that ELI, as an intermediate holding company, conducts no actual business, nor does it retain any employees. Any benefits ELI accrues come from the work done by its subsidiary operating companies.

In the district court, LWCC and Liberty alternatively argued that Dyson performed work for Seacor. In his deposition, however, Guidry stated quite plainly that Dyson performed no work for Seacor, nor did Dyson consider himself an employee of Seacor's.

### 3.

The third factor looks for any contract or other agreement regarding the employee. Liberty and LWCC are correct to point to the lack of a contract between Seacor and Liberty regarding Dyson's employment. Nevertheless, the evidence presented in the depositions strongly suggests that there was an understanding between Seacor and Liberty to entitle Liberty to call Dyson a "leased employee from

4

Seacor" at the time of his accident. The fact that Liberty referred to Dyson as such on the accident report evinces an explicit acknowledgment of this implicit agreement.

### 4.

The fourth factor examines whether the employee acquiesced in the new work situation. The "focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them." *Brown v. Union Oil Co.*, 948 F.2d 674, 678 (5th Cir. 1993). Each side can make fairly persuasive arguments that this factor ought to be decided in its favor.

Liberty and LWCC accurately point out that Dyson believed that he and his boss, Guidry, were employees of ELI. It is obvious from the depositions, however, that a great deal of confusion existed on the part of management and employees as to the precise arrangement that existed among Seacor, ELI, and Liberty. Moreover, as an intermediate holding company, ELI technically possessed no employees of its own, making it impossible for Dyson to have been employed by ELI.

Secondly, after the 1999 merger, Dyson willingly began managing the Liberty asset in Venice. Regardless of who Dyson believed his technical employer to be, Dyson's awareness of his new work situation with Liberty beginning in late 1999 is sufficient to demonstrate acquiescence on his part, and this factor weighs in favor of finding borrowed employee status.

### 5.

The fifth factor asks whether the original employer terminated its relationship with the employee. This factor does not ask whether the lending employer severed its relationship completely. *Capps v. N.KL. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986). Rather, we are asked to examine the nature of the lending employer's relationship with the employee while the borrowing occurred. *Id.* at 618. Liberty and LWCC maintain that Dyson had less contact with Liberty than with Seacor or ELI. The facts, however, do not support this conclusion in any way.

Although Seacor issued his checks, Dyson appears to have had no contact with Seacor whatsoever. As stated above, Dyson's bosses were officers of both ELI and Liberty, and Guidry's deposition makes plain that neither he nor Dyson ever performed any work for Seacor. On the other hand, many facts suggest that Dyson had significant contact with Liberty.

Most importantly, Dyson worked at a Liberty site and managed its employees. Because Liberty is a wholly owned subsidiary, its assets are admittedly also ELI's. ELI, however, performed no work on the site and retained no employees, and all work appears to have been done for Liberty directly. Additionally, Liberty furnished Dyson with an expense account and a vehicle to perform his duties to Liberty. Liberty and LWCC's argument that Dyson's only contact with Liberty was the supervision of Liberty employees is patently false, and this fifth factor must be considered in favor of borrowed employee status.

### 6.

The sixth factor examines who furnished the employee with the tools and place of business necessary to carry out his duties. Liberty furnished Dyson with a place of employment. Dyson worked out of a trailer owned by Liberty and located on Liberty's work site. Additionally, Liberty assigned Dyson the

vehicle that was involved in the accident. Finally, Liberty regularly reimbursed Dyson for expenses he incurred in the course of his employment. Thus, Liberty, and not Seacor, furnished Dyson with the means necessary to conduct his daily business. Liberty and LWCC again attempt to argue that because Liberty is a wholly-owned operating company of ELI's, Dyson's office and car ought to be considered ELI's assets and not Liberty's. Yet again, all of Liberty's assets may be ELI's by definition, but they are Liberty's in practice.

### 7.

The seventh factor examines how long the arrangement between employers existed. This court has noted that when "the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee," but that "the converse is not true." *Capps*, 784 F.2d at 618. When ELI acquired Liberty in 1999, Dyson began his employment situation that continued up until the time of his accident in 2001. Though it is debatable whether approximately a year and a half is a "considerable" length of time, the district court was correct in determining that this evidence weighs in favor of finding for borrowed employee status.

### 8.

The eighth factor looks to who had the right to discharge the employee. The power to terminate Dyson's employment rested only with Guidry and/or Sarne, both being officers of ELI and Liberty. Liberty and LWCC's contention that Guidry is an employee of Seacor contradicts the evidence, because Guidry, despite being on Seacor's payroll (as all management of ELI and Liberty appear to have been), worked solely with ELI and Liberty. Thus, the right to discharge Dyson lay with Liberty, lending further weight to finding for United States Fire.

### 9.

The ninth factor is who had the obligation to pay the employee. The district court properly found that Dyson received his paycheck from Seacor and that this factor weighs against a finding for borrowed employee status. Neither party disputes this finding.

### 10.

The tenth and final factor examines who hired the employee. The selection and promotion of employees rested with Guidry and Sarne. Guidry, in his deposition, stated that he promoted Dyson to manager of Liberty's Venice shore base in 1999 after ELI acquired Liberty. Yet again, Liberty and LWCC's only argument is that Guidry and Sarne are more closely allied to Seacor and/or ELI than to Liberty. Because Guidry and Sarne are officers of Liberty and ELI, this is certainly not the case, and Guidry maintained in his deposition that he had no contact with Seacor aside from receiving his checks from them. Accordingly, this factor weighs in favor of borrowed employee status.

### IV.

We conclude, in light of the ten factors, that Dyson was, as a matter of law, the borrowed employee of Liberty. As a result, Liberty and Seacor are liable *in solido* for Dyson's injuries, thereby entitling United States Fire to a fifty-percent contribution from LWCC.

AFFIRMED.