# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-30523

United States Court of Appeals
Fifth Circuit

**FILED**

February 7, 2019

Lyle W. Cayce
Clerk

DWAYNE MOSLEY,

> Plaintiff–Appellant,

v.

WOOD GROUP PSN, INCORPORATED; FIELDWOOD ENERGY, L.L.C.; LINEAR CONTROLS, INCORPORATED; LINEAR CONTROLS OPERATING, INCORPORATED,

> Defendants–Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:16-CV-107

Before CLEMENT, OWEN, and HO, Circuit Judges.

PER CURIAM:*

Dwayne Mosley sued multiple defendants for negligence and gross negligence after he slipped and fell on an oil and gas platform off the coast of Louisiana. The district court dismissed his claims against two defendants as barred under the Outer Continental Shelf Lands Act (OCSLA) and the Longshore and Harbor Workers' Compensation Act (LHWCA). The district

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-30523

court also granted summary judgment in favor of the defendants as to Mosley's remaining claims, concluding that causation had not been shown. We affirm the district court's grant of summary judgment as to Fieldwood Energy LLC and Wood Group PSN, Inc., and we reverse and remand as to Linear Controls, Inc. and Linear Controls Operating, Inc.

**I**

Mosley was injured while working on an oil and gas platform owned or operated by Fieldwood Energy LLC (Fieldwood), a party to this suit and appellee in this court. Quality Production Services (QPS), who is not a party to this suit, had a Master Service Contract with Fieldwood to provide production personnel at Fieldwood's request. In 2014, Mosley submitted his resume to QPS for consideration as a contract operator. QPS forwarded Mosley's resume to Fieldwood. Fieldwood then selected Mosley to work as a contract operator on its platforms located off the coast of Louisiana. Mosley became a payroll employee of QPS, and from July 2014 to May 2015, Mosley worked as a production manager on Fieldwood's platforms.

Like QPS, Wood Group PSN, Inc. (Wood Group) supplied production personnel to Fieldwood. Fieldwood and Wood Group entered into a Master Service Contract substantially similar to that between Fieldwood and QPS. Wood Group was a defendant in the district court and is an appellee in this court. Darrell Trahan was a payroll employee of Wood Group from October 2014 to approximately October 2015. During part of his tenure with Wood Group and at the time of Mosley's accident, Trahan worked as "B operator" on Fieldwood's West Delta 80-D platform. Jessie Villemarette was a payroll employee of Wood Group from December 2014 through September 2016. He worked as the lead operator and person in charge of the West Delta 80-D platform on the day that Mosley fell.

2

No. 18-30523

Fieldwood hired Linear Controls, Inc. and Linear Controls Operating, Inc. (collectively, Linear), who are parties to this suit and appeal, to disconnect and assist with moving a transformer on the platform that was in a "tight spot." Mosley's fall occurred the day after the transformer was moved. Mosley alleges that "[d]uring Linear's preparation of the transformer for moving, or as a result of its being moved, the transformer's spigot became damaged and leaked a slippery fluid."

The day before Mosley fell, Mosley used a crane to help move the transformer to a place where it could be loaded onto a boat. Trahan noticed that the spigot had been "messed up" and had a "little leak" so he placed a bucket underneath to catch any drippings. Trahan described the leak as being akin to a "leaky faucet." Because the spigot was leaking, Trahan attached a hose and air pressure pump to the transformer in order to drain the remaining fluid.

Either as a result of the initial leak or from Trahan's use of the hose and pump, a mixture of hydraulic fluid and water ended up on the platform's deck. When Mosley first saw Trahan at the transformer immediately after it was moved, Mosley did not see any spillage on the walking surface of the deck. According to Mosley, the only leakage was spilling into a bucket at that time. The first time that Mosley observed spilled fluid on the deck was when he later saw Trahan with a spigot and water hose, spraying the mixture all over the deck. Conversely, Trahan explained that when the transformer "land[ed] on the deck," the fluid was already leaking and coming out at a "pretty good clip." Trahan got a bucket under the leak "within a minute or two," but after fluid had already dripped onto the deck. Trahan attempted to clean the effluents and then barricaded the area until the next morning. Even though Trahan said that the the deck was "fine," he cleaned the area again the next day. However, later that day, Mosley slipped and fell walking across the deck.

3

No. 18-30523

Mosley fell in the general area where he saw Trahan spraying the water hose the day before.

Mosley sued Wood Group and Fieldwood for negligence and gross negligence in the Southern District of Texas. After the case was transferred to the Eastern District of Louisiana, Mosley filed a second amended complaint, adding Linear as a defendant. Fieldwood, Wood Group, and Linear each filed a separate motion for summary judgment, and the district court granted all three motions.

The district court employed the nine-factor test from *Ruiz v. Shell Oil Co.*[1] to conclude that Mosley, Villemarette, and Trahan were Fieldwood's borrowed employees. Then, the court held that for Mosley's claims against Fieldwood and Wood Group, "his exclusive remedy lies in the LHWCA, applicable by virtue of OCSLA." Because Mosley brought only negligence claims, the court granted summary judgment. The court further held that Linear could not be liable for negligence because Trahan's negligence was a superseding cause of Mosley's injuries. Mosley appeals.

## II

This case falls under OCSLA, which applies to "all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed" of the outer Continental Shelf.[2] Under OCSLA, when an employee is injured "as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources," his exclusive remedy lies in the LHWCA.[3]

---

[1] 413 F.2d 310 (5th Cir. 1969).
[2] 43 U.S.C. § 1333(a)(1).
[3] *Id.* § 1333(b).

4

No. 18-30523

Under the LHWCA, "liability of an employer . . . shall be exclusive and in place of all other liability of such employer to the employee,"[4] meaning that a covered employee's exclusive remedy against his employer in a negligence case is governed by the LHWCA.  Fieldwood argues that Mosley was its borrowed employee and therefore, that his exclusive remedy against Fieldwood is under the LHWCA.  Wood Group's argument is twofold.  First, it contends that Villemarette and Trahan, who were on Wood Group's payroll, were Fieldwood's borrowed employees and therefore, their negligence cannot be attributed to Wood Group under a vicarious liability theory.  Second, Wood Group contends that if Mosley, Trahan and Villemarette are all Fieldwood's borrowed employees, Mosley cannot assert a cause of action against his co-employees under the exclusive remedy provision in 33 U.S.C. § 933(i).  Section 933(i) of the LHWCA says that "[t]he right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured . . . by the negligence or wrong of any other person or persons in the same employ."[5]  The parties agree that based on this section, if Villemarette, Mosley, and Trahan are found to be borrowed employees of Fieldwood, Wood Group cannot be held vicariously liable for their negligent actions because Mosley was not entitled to recover for the negligence of "persons in the same employ."

In his reply brief, Mosley argues that Wood Group and Fieldwood can both be liable as dual employers under Louisiana law.  Issues raised for the first time in a reply brief are waived.[6]

Mosley argues that the district court erred when it held Mosley, Villemarette, and Trahan were Fieldwood's borrowed employees.  In *Ruiz*, we

---

[4] 33 U.S.C. § 905(a).

[5] 33 U.S.C. § 933(i).

[6] *Yohey v. Collins*, 985 F.2d 222, 225 (5th Cir. 1993).

No. 18-30523

delineated the following nine factors to determine whether an individual qualifies as a borrowed employee rather than an independent contractor:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> (2) Whose work is being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?[7]

"No single factor, or combination of them, is determinative."[8] Many cases have placed emphasis on the control factor,[9] but we have recognized that certain factors may be more important in light of the facts of a particular case.[10]

"This court reviews a grant of summary judgment de novo."[11] Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[12] We "view[] the evidence in the light most favorable to the nonmoving party."[13]

---

[7] *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 616-17 (5th Cir. 1986); *see also Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969).

[8] *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 676 (5th Cir. 1993) (per curiam) (citations omitted); s*ee also Ruiz*, 413 F.2d at 312 ("[N]o one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship.").

[9] *Capps*, 784 F.2d at 617 (citations omitted).

[10] *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (5th Cir. 1985).

[11] *James v. Woods*, 899 F.3d 404, 407 (5th Cir. 2018) (citing *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012)).

[12] *McMurray v. ProCollect, Inc.*, 687 F.3d 665, 669 (5th Cir. 2012) (quoting *Barker v. Halliburton Co.*, 645 F.3d 297, 299 (5th Cir. 2011)).

[13] *Id.* (quoting *Barker*, 645 F.3d at 299).

No. 18-30523

**1**

Mosley argues that Fieldwood did not control Mosley, Villemarette, and Trahan. Control "is perhaps the most universally accepted standard for establishing an employer-employee relationship."[14] "In considering whether the power exists to control and direct a servant, a careful distinction must be made 'between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking.'"[15] "Co-operation," as opposed to "subordination," is insufficient "to create an employment relationship."[16]

Although Mosley was a payroll employee of QPS, Fieldwood selected him to work on its platforms. QPS forwarded Mosley's resume to Fieldwood. After selecting Mosley, Fieldwood also determined the platform on which he would work. Fieldwood assigned Mosley to the West Delta 80-D platform, and he reported to Villemarette, who in turn reported to Frank Cornay, Fieldwood's field foreman. Mosley also received his daily work instruction or projects from Villemarette, who was the person in charge (PIC) of the platform. Fieldwood set Mosley's schedule and approved his overtime hours. Mosley does not point to any evidence that QPS gave him work-related instructions while on the platform. Mosley testified that his only contact with QPS concerned his time sheets.

Like Mosley, Trahan also reported to Villemarette. If Trahan had a question about his work, he would contact Villemarette. Trahan attended Fieldwood's daily safety meetings where he would discuss his tasks for the day. Villemarette was assigned to the West Delta 80-D platform by Fieldwood. Fieldwood set Villemarette's schedule and approved any overtime hours he

---

[14] *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312 (5th Cir. 1969).

[15] *Id.* at 313 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 222 (1909)).

[16] *Id.*

worked. All of his "orders, directions, [and] instructions regarding [his] actual work" came from Villemarette.

While on the platform, QPS and Wood Group did not exercise control over Mosley, Trahan, or Villemarette. Fieldwood controlled Villemarette, who, in turn, controlled Trahan and Mosley. Mosley argues that Fieldwood, through Cornay, could not exercise control because Cornay was not always physically present on the platform. He argues that Cornay's daily emails were insufficient to establish control. Mosley fails to cite any relevant precedent to support that proposition, and we are aware of none. Cornay communicated with Villemarette at least twice a day and advised him of any activity that would be taking place on the platform. Fieldwood exercised control over Villemarette, Trahan, and Mosley, even if remotely.

Mosley also argues that Fieldwood did not exercise control "because they [Mosley, Trahan, and Villemarette] were specialists who didn't need to be told how to perform their jobs." However, we have held that the fact that an employee has specialized skills does not preclude borrowed employee status.[17] In *Melancon*, we compared the borrowing employer's control with the original employer's control.[18] We noted that the borrowing employer told the employee "what work to do, and when and where to do it."[19] The original employer "gave no instructions" other than to work for the borrowed employer.[20] The *Melancon* decision aligns with the facts here: Fieldwood instructed Villemarette, Trahan, and Mosley on what to do and when and where to do it. Neither QPS nor Wood Group provided the men any work-related instructions. Accordingly, the control factor weighs in favor of borrowed employee status for all three men.

---

[17] *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988) (citation omitted).
[18] *Id.* at 1244-45.
[19] *Id.* at 1245.
[20] *Id.*

No. 18-30523

**2**

The second factor—whose work is being performed—is straightforward and weighs in favor of borrowed employee status. Mosley, Trahan, and Villemarette worked to further Fieldwood's business. QPS and Wood Group's work, as related to the employees at issue, was to furnish employees to Fieldwood. Those facts are sufficient for this factor to weigh in favor of borrowed employee status.[21]

**3**

"The third factor asks whether an agreement or understanding existed between the original and the borrowing employer."[22] The district court held that fact issues existed as to the master service agreements' effect. Those agreements provided that Wood Group and QPS, respectively, "shall be, and perform at all times as, an independent contractor." The agreements further provided that neither Wood Group's employees nor QPS's employees "shall be . . . subject to the control or direction of [Fieldwood] as to the details of the Work." Mosley argues that, based on those provisions, the master service agreements weigh against borrowed employee status. However, the agreements also required Wood Group and QPS to obtain endorsements to their insurance policies, including a borrowed servant endorsement. This suggests that Fieldwood, Wood Group, and QPS contemplated that Mosley, Trahan, and Villemarette would be borrowed employees.

We agree with the district court that a fact issue exists regarding this factor.[23] The master service agreements do not foreclose a finding that Villemarette, Mosley, or Trahan were borrowed employers.[24] This fact issue

---

[21] *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986).
[22] *Id.* at 617.
[23] *See Gaudet v. Exxon Corp.*, 562 F.2d 351, 358 (5th Cir. 1977).
[24] *See Alexander v. Chevron, U.S.A.*, 806 F.2d 526, 528-29 (5th Cir. 1986).

does not preclude summary judgment, however, "when the remaining factors clearly point to borrowed-employee status."[25] "The reality at the worksite and the parties' actions in carrying out a contract . . . can impliedly modify, alter, or waive express contract provisions."[26] We must therefore consider whether "sufficient 'determinative factual ingredients'" are undisputed.[27]

### 4

The district court held that the fourth factor—acquiescence—weighs in favor of a borrowed employee finding. "The focus of this factor is whether the employee was aware of his work conditions and chose to continue working in them."[28] Mosley failed to brief this factor and has forfeited any argument that it weighs against borrowed employee status.[29] In any event, Mosley, Villemarette, and Trahan had worked on the West Delta 80-D for months prior to Mosley's injury. In *Brown*, the employee "worked, slept and ate in Union's field for a month prior to his accident," and we concluded that was "a sufficient amount of time for Brown to appreciate the new work conditions."[30]

### 5

Mosley challenges the district court's conclusion that "Wood Group and QPS terminated their relationship with Villemarette, Mosley, and Trahan because they had little contact with the employees during their time on the platform." Mosley concedes that the relationships "grew attenuated" while the employees were working offshore but argues that because Wood Group and

---

[25] *Billizon v. Conoco, Inc.*, 993 F.2d 104, 106 (5th Cir. 1993) (citations omitted).

[26] *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1245 (5th Cir. 1988) (citations omitted).

[27] *Gaudet*, 562 F.2d at 358 (quoting *Kliff v. Travelers Ins. Co.*, 402 F.2d 129, 131 (5th Cir. 1968)).

[28] *Brown v. Union Oil Co. of Calif.*, 984 F.2d 674, 678 (5th Cir. 1993).

[29] *In re Southmark Corp.*, 163 F.3d 925, 934 n.12 (5th Cir. 1999).

[30] *Brown*, 984 F.2d at 678.

QPS did not completely sever their relationship, this factor creates a fact question.

We "do[] not ask whether the lending employer severed its relationship completely. Rather, we . . . examine the nature of the lending employer's relationship with the employee while the borrowing occurred."[31]    Mosley, Villemarette, and Trahan had almost no contact with QPS and Wood Group, respectively. While working offshore, Mosley's contact with QPS was limited to emailing or faxing his timesheet. All of Mosley's "orders, directions, or instructions regarding his actual work came from Fieldwood." Similarly, Fieldwood provided all of Villemarette's work instructions and work assignments, as well as his transportation, food, and lodging. He had "very little contact with Wood Group" and "none of it related to [his] actual work assignments." Trahan worked under Villemarette's supervision and received his tasks at daily safety meetings. Mosley, Villemarette, and Trahan all had frequent work-related contact with Fieldwood and very little with QPS and Wood Group. We agree with the district court that this factor weighs in favor of borrowed employee status.

**6**

The district court concluded that the sixth factor, which considers who provided the tools and place of performance, weighs in favor of a borrowed

---

[31] *U.S. Fire Ins. Co. v. Miller*, 381 F.3d 385, 390 (5th Cir. 2004) (citing *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617-8 (5th Cir. 1986)); s*ee also Melancon*, 834 F.2d at 1246 (citation omitted) ("This factor does not require a lending employer to sever completely its relationship with the employee, because such a requirement would effectively eliminate the 'borrowed employee' doctrine.").

No. 18-30523

employee finding.  Mosley failed to brief this factor and forfeited any argument that it weighs against borrowed employee status.[32]

**7**

The district court held that the length of employment, "at least four months," was neutral.  Mosley failed to brief this factor and forfeited any argument that it weighs against borrowed employee status or that it creates a material issue of fact inappropriate for summary judgment.[33]

**8**

Under the eighth factor, we consider who has the right to discharge the employee from the borrowing employer's services.[34]  Mosley argues that Fieldwood could not terminate Mosley, Villemarette, or Trahan from QPS and Wood Group, respectively.  That is not the relevant consideration.[35]  Fieldwood could remove the men from their positions on the platform.  This factor weighs in favor of borrowed employee status.[36]

**9**

The ninth factor asks who had the obligation to pay the employees.[37]  Fieldwood reviewed and approved the employees' timesheets.  QPS paid Mosley and Wood Group paid Villemarette and Trahan based on the timesheets approved by Fieldwood.  Under the master service agreements, Fieldwood had an obligation to reimburse QPS and Wood Group for the work performed.  This weighs in favor of borrowed employee status.[38]

---

[32] *Southmark*, 163 F.3d at 934 n.12 (5th Cir. 1999).

[33] *Id.*

[34] *Capps*, 784 F.2d at 618.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

12

No. 18-30523

Seven of the nine factors weigh in favor of borrowed employee status, one is neutral (factor seven), and one involves an unresolved fact issue (factor three). Even if we assume that factor three weighs in favor of Mosley, the summary judgment record establishes that Villemarette, Mosley, and Trahan were Fieldwood's borrowed employees.[39] Accordingly, the district court did not err in holding that Mosley's claims against Fieldwood and Wood Group fail.

## III

Mosley alleges that "Linear was negligent both in (1) failing to properly prepare the transformer for its move, and/or (2) failing to give proper signals to the crane operator so as to allow the transformer to be damaged during transit" and argues that the district court erred when it found Trahan's negligence to be an intervening, superseding cause of Mosley's injuries. Louisiana law applies to this question through OCSLA. "OCSLA adopts the law of the adjacent state (Louisiana) as surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations."[40] "Under Louisiana law, '[t]he duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability.'"[41] The duty-risk analysis requires a plaintiff to satisfy five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries

---

[39] *Billizon v. Conoco, Inc.*, 993 F.2d 104, 106 (5th Cir. 1993) (affirming summary judgment when factor seven was neutral and factor three had a fact question).

[40] *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 560 (5th Cir. 2003) (citing *Bartholomew v. CNG Producing Co.*, 832 F.2d 326, 328 (5th Cir. 1987); 43 U.S.C. § 1333(a)(2)(A)).

[41] *Audler v. CBC Innovis, Inc.*, 519 F.3d 239, 249 (5th Cir. 2008) (alteration in original) (quoting *Lehmann v. Essen Lane Daquiris*, 923 So. 2d 627, 633 (La. 2006)).

(the scope of liability or scope of protection element); and (5) the actual damages (the damages element).[42] However, if an unforeseeable intervening cause occurs, it will relieve the original tortfeasor of liability if "the intervening cause [superseded] the original negligence and *alone* produced the injury."[43] "An intervening cause is one which comes into play after the defendant's negligent conduct has ceased but before the plaintiff suffers injury."[44]

In this case, the district court concluded that Mosley "d[id] not provide any evidence suggesting that there was oil on the deck prior to Trahan opening the spigot," and thus "even if Linear Controls was negligent in causing the transformer to leak, Mosley would not have been injured without Trahan's intervening negligence." We disagree. A fact question exists as to whether the initial leak resulted in fluid on the deck and contributed to Mosley's injuries.

In his deposition, Mosley says that when he first saw Trahan at the transformer immediately after it was moved, he did not see any spillage on the walking surface of the deck. At that time, the only leakage was spilling into a bucket. The first time that Mosley observed spilled fluid on the deck was when he later saw Trahan with a spigot and water hose, spraying the mixture all over the deck. According to Mosley, it was not until Trahan stepped in that fluid spilled onto the deck. Trahan's story differs. When he was deposed, Trahan explained that when the transformer "land[ed] on the deck," the fluid was already leaking. He confirmed that it was coming out at a "pretty good clip to cover that much area." Although Trahan got a bucket under the leak "within a minute or two," his version of events suggests that the leak resulted

---

[42] *Id.* (quoting *Lehmann*, 923 So. 2d at 633).

[43] *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 618 (5th Cir. 2018) (quoting *Adams v. Rhodia, Inc.*, 983 So. 2d 798, 808 (La. 2008)) (emphasis added).

[44] *Vince v. Koontz*, 213 So. 3d 448, 457 (La. App. 5 Cir. 2017) (citing *Adams*, 983 So. 2d at 808).

in fluid dripping on the deck prior to him opening the spigot.  Mosley's and Trahan's differing versions of events create a fact question as to whether Trahan's actions "alone produced the injury," or whether the existing fluid contributed to the cause.  Accordingly, the district court erred in granting summary judgment.

*     *     *

We AFFIRM the district court's grant of summary judgment as to Fieldwood and Wood Group, and we REVERSE and REMAND as to Linear for proceedings consistent with this opinion.